309 Ga. 385
FINAL COPY

S20A0035.  DAVENPORT v. THE STATE.

BETHEL, Justice.

Brian Colby Davenport appeals his convictions for malice murder and other crimes in connection with the death of Debora Lynn Abney.[1]   Davenport contends that the evidence was

_____

[1] The crimes occurred on March 11, 2016.  On June 8, 2016, a Catoosa County grand jury indicted Davenport for malice murder, felony murder, aggravated assault, two counts of making a false statement, two counts of possession of a firearm during the commission of a felony, and two counts of tampering with evidence. Davenport was tried by a jury in March 2017 and was found guilty of all counts. The trial court vacated the felony murder count and sentenced Davenport to life in prison without the possibility of parole for malice murder, 20 years to serve concurrent for aggravated assault, five years to serve concurrent for each count of making a false statement, five years to serve consecutive for each count of possession of a firearm during the commission of a felony, and ten years to serve concurrent for each count of tampering with evidence.
     On April 4, 2017, Davenport filed a motion for new trial, which was subsequently amended. The trial court denied the motion for new trial on June 25, 2019, but amended Davenport's sentence by vacating the sentence for aggravated assault and merging the count into malice murder.  The trial court also vacated the sentence for the second count of possession of a firearm during the commission of a felony and purported to merge that conviction with the malice murder count, although it was actually vacated as a matter of law. Appellate counsel filed a timely notice of appeal on July 16, 2019. This case was docketed in this Court's term beginning in December 2019, and submitted for a decision on the briefs.

insufficient to convict him, and that the trial court erred by admitting improper character evidence under OCGA § 24-4-404 (b) ("Rule 404 (b)") and certain hearsay evidence. We affirm because the evidence was legally sufficient to support Davenport's convictions, any error in the admission of the Rule 404 (b) evidence was harmless, and the trial court did not abuse its discretion in admitting the hearsay evidence. However, today we also announce that we will end our practice of sua sponte review of the constitutional sufficiency of the evidence supporting convictions in appeals of non-death penalty murder cases, beginning with cases that docket to the term of court that begins in December 2020. The Court will begin assigning cases to the December Term on August 3, 2020.

Viewed in the light most favorable to the jury's verdicts,[2] the evidence shows that on March 11, 2016, deputies from the Catoosa County Sheriff's office responded to a reported shooting. Upon

---

[2] See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

arrival, an officer discovered Abney slumped over in the front passenger seat of a vehicle. Davenport was also at the scene, shirtless.

Davenport initially told officers that he and Abney had been in court earlier that day for a Department of Family and Children Services ("DFCS") hearing concerning their two younger children and that Abney was upset after the hearing. After leaving the courthouse, they stopped at a few locations to purchase alcohol and items to make sandwiches. The two then went on a picnic, where Abney began drinking. Davenport told officers that Abney shot herself when he was standing at the trunk of the vehicle. He said that he ran around the vehicle, saw that Abney had shot herself, and called his mother (who called another person who then called 911).

A GBI agent testified that when he arrived on the scene, he observed Davenport wiping his head, neck, and torso with a cloth. He did not observe any blood on Davenport, but did notice drops of

blood on Davenport's shoes.[3]  A gun was found in Abney's left hand, though Abney was right-handed.  Mud and soil were found impacted in the barrel of the gun. The GBI agent testified the mud and soil should not have been in the gun if the weapon had remained in Abney's hand after being fired.  Luminol testing later revealed the presence of blood on the dashboard of the vehicle, and the pattern indicated that it had been wiped away.  Blood particles were also found on the front windshield.  Finally, Abney had been shot in the back of the head, and gunshot primer residue was found on Davenport's clothing.  The medical examiner concluded that the manner of death was homicide.

During his interview with police, after being given *Miranda* warnings,[4] Davenport initially stated that upon seeing that Abney had shot herself and was bleeding, he took off running.  But after being confronted with the finding of mud in the barrel of the gun,

---

[3] Although the GBI agent swabbed Davenport's hands for gunshot residue, the test could not be conducted by the crime lab because the samples were improperly packaged.

[4] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

Davenport claimed that after he heard the gunshot, he saw the gun go flying out of the driver's side door. When the investigator told Davenport that the investigator had a "problem" with Davenport's revised version of events, Davenport then stated that the gun fell between the seat and the console in the vehicle, and that he got in the driver's seat to pick up the gun. Davenport said that he dropped the gun getting out of the car, and then stuck the gun back in Abney's left hand. Davenport told investigators that he did not tell them this version of events initially because he was worried they would think that he shot Abney.

Two of Abney's daughters testified about witnessing Davenport strike Abney and, in one instance, observed Davenport holding a gun to Abney's head. A police officer testified that he had previously responded to a domestic violence incident between Davenport and Abney. A DFCS caseworker who had been working with the family testified that she observed recent injuries to Abney on one visit, which Abney told her resulted from Davenport hitting and biting her, and that on another occasion, Abney called her and confided in

her that she was afraid for her life. Abney's mother also testified that she observed bruising on Abney, who told her that Davenport hit her, and that Abney told her she was afraid that Davenport would kill her. Abney's other daughter testified that she saw Davenport hitting Abney, that she would often go to pick up her mother to get her away from Davenport, and that Davenport regularly threatened Abney. Additionally, Abney's former landlord testified that she would hear Abney and Davenport arguing, and then would see bruises on Abney the following day.[5] Finally, the expert witness called by the defense conceded that it was unlikely that Abney contorted herself enough in the vehicle to shoot herself with her non-dominant hand in the back of her head.

1. Davenport argues that the evidence is legally insufficient to

---

[5] Davenport's ex-wife also testified at trial regarding the frequent physical abuse she suffered at the hands of Davenport, including several instances of shoving, punching, and choking, and threatening to kill her if she left him. Davenport's daughter with his ex-wife also testified regarding the instances of physical violence she witnessed against her mother, and three other witnesses testified regarding an incident, 27 years prior to trial, in which Davenport attacked his ex-wife in front of others, leading to Davenport's arrest.

sustain his conviction for malice murder because the evidence presented at trial did not exclude the reasonable hypothesis that Abney committed suicide. Although not raised as error, we also evaluate the legal sufficiency of the evidence presented at trial on the other counts for which Davenport was convicted.[6]

When we consider the sufficiency of the evidence as a matter of federal due process, we view the evidence in the light most favorable to the verdict and evaluate whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). "Under this review, we must put aside any questions about conflicting evidence, the credibility of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact." (Citation and punctuation omitted.) *Mims v. State*, 304 Ga. 851, 853 (1) (a) (823 SE2d 325) (2019). Further, as a matter of Georgia statutory law,

---

[6] But see our discussion in Division 4 regarding this Court's impending termination of the practice of sua sponte consideration of sufficiency.

"[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis — only those that are reasonable." (Citation and punctuation omitted; emphasis in original.) *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019). Whether a hypothesis is reasonable or not is for the jury to decide. See id.; *Outler v. State*, 305 Ga. 701, 703 (1) (a) (827 SE2d 659) (2019); *Murray v. State*, 271 Ga. 504, 505 (1) (521 SE2d 564) (1999).

Here, Davenport's own expert witness testified that it was unlikely that Abney shot herself in the back of the head. The State's forensic pathology expert and crime scene investigation expert both determined the case to be a homicide rather than a suicide. Further, numerous pieces of evidence suggested that the crime scene had been staged by the time law enforcement arrived: the gun was found in Abney's left hand even though she was right-handed, mud and

dirt were in the barrel of the gun, and the blood pattern on the dashboard and glove box area appeared to have been wiped down. Investigators also found gunshot primer residue on Davenport's clothes. Finally, Davenport gave inconsistent stories to police, and he had a history of physical violence and threats toward Abney. Considering all the evidence in the light most favorable to the verdicts, we conclude that the jury was authorized to find beyond a reasonable doubt that Davenport was guilty of malice murder and the other crimes of which he was convicted. The jury was also authorized to determine that the proved facts were not only consistent with Davenport's guilt but that they also excluded every other reasonable hypothesis as to how Abney died. Thus, when viewed as a whole, the evidence presented at trial was sufficient to support Davenport's convictions as a matter of due process and under OCGA § 24-14-6. See *Frazier v. State*, 308 Ga. 450, 454 (2) (b) (841 SE2d 692) (2020).

2. Davenport next argues that the trial court committed a harmful error when it permitted the State, pursuant to OCGA § 24-

4-404 (b), to present evidence that Davenport allegedly abused his ex-wife more than 20 years before Abney's death. We disagree that the admission of this evidence was harmful to Davenport.

Assuming without deciding that the trial court abused its discretion in admitting the challenged evidence, any error was harmless and does not require reversal. "A nonconstitutional error is harmless if it is highly probable that the error did not contribute to the verdict." *Adkins v. State*, 301 Ga. 153, 158 (3) (a) (800 SE2d 341) (2017). Here, the evidence presented against Davenport, though circumstantial, was very strong. As noted above, the forensic evidence indicated that Davenport shot Abney, attempted to cover up the crime, and then fabricated a story to the police that Abney killed herself. Additionally, substantial evidence was introduced detailing Davenport's history of violence against Abney, which included threatening her with a firearm. Thus, considering the evidence presented at trial and weighing it as reasonable jurors would, we conclude that it is highly probable the outcome of the trial would have been no different had the trial court excluded evidence

of Davenport's history of violence against his ex-wife. See *Williams v. State*, 302 Ga. 147, 153-154 (3) (805 SE2d 873) (2017) (any error in admitting evidence of violence against two ex-girlfriends was harmless where evidence was overwhelming and physical evidence contradicted defendant's version of events).

3. Lastly, Davenport argues that the trial court abused its discretion in admitting hearsay evidence of prior difficulties between him and Abney.[7] We disagree.

The State filed a notice of intent to introduce residual hearsay testimony pursuant to OCGA § 24-8-807 ("Rule 807"). Under OCGA § 24-8-807,

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that: (1) The statement is offered as evidence of a material fact; (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

---

[7] Davenport does not challenge the admissibility of the evidence of prior difficulties between him and Abney under OCGA § 24-4-404 (b).

The residual hearsay exception is "to be used very rarely and only in exceptional circumstances, and only when there exists certain exceptional guarantees of trustworthiness and high degrees of probativeness and necessity." *Tanner v. State*, 301 Ga. 852, 855 (1) (804 SE2d 377) (2017). "Whether there are exceptional guarantees of trustworthiness is a determination that focuses on the *declarant* and the circumstances under which the declarant made the statement to the witness." (Emphasis in original.) *Miller v. State*, 303 Ga. 1, 5 (2) (810 SE2d 123) (2018). "A trial court's decision to admit hearsay evidence under Rule 807 is reviewed for an abuse of discretion." *State v. Holmes*, 304 Ga. 524, 529 (2) (a) (820 SE2d 26) (2018). "This Court is particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." (Citation and punctuation omitted.) Id.

The State offered statements Abney made about Davenport's threats and physical abuse to her mother and the DFCS caseworker

who had been working closely with her family, as well as statements from Abney's daughter about Davenport's abuse of Abney that she witnessed, as an explanation for Davenport's motive. Although Davenport claims Abney's statements lack guarantees of trustworthiness due to substance abuse and mental illness issues, the Court

> cannot say that statements from a wife to her friends or family . . . which describe acts of domestic violence, do not, in fact, bear an increased level of trustworthiness. Likewise, in light of the often-secretive nature of domestic violence, we can also envision that such statements might be highly probative.

*Smart v. State*, 299 Ga. 414, 422 (3) (788 SE2d 442) (2016). See also *Jacobs v. State*, 303 Ga. 245, 251 (2) (811 SE2d 372) (2018) (concluding that the trial court did not abuse its discretion in determining that the statements from the victim to her friends and her own text messages describing the nature of her abusive relationship with the defendant prior to her death had the requisite exceptional guarantees of trustworthiness to be admissible at trial pursuant to Rule 807). Moreover, to the extent Abney's daughter

witnessed Davenport hitting Abney, the daughter's testimony regarding the abuse she witnessed is not hearsay. See *De La Cruz v. State*, 303 Ga. 24, 28 (4) (810 SE2d 84) (2018) (testimony of witness regarding tumultuous relationship between defendant and victim not hearsay where it was "based purely upon his observation of the couple"). Here, some of Abney's statements about Davenport's threats and physical abuse were made to a close family member — that is, her mother. Further, the testimony of the DFCS caseworker who had been working closely with her family was cumulative of the testimony of these and other witnesses who testified to the regular abuse Davenport inflicted upon Abney and Abney's fear of Davenport. Therefore, even if it was erroneously admitted, the DFCS caseworker's testimony was harmless. See *Anglin v. State*, 302 Ga. 333, 336 (2) (806 SE2d 573) (2017) ("[T]he erroneous admission of hearsay is harmless where substantial, cumulative, legally admissible evidence of the same fact is introduced."). Moreover, we have considered the cumulative effect of this presumed error along with the error assumed in Division 2 and do

not find that they collectively resulted in harm to Davenport.  See *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020).

4.  In Division 1 of this opinion, we employed our customary practice of determining sua sponte whether sufficient evidence supported *all* of Davenport's convictions as a matter of constitutional due process, even though he raised a sufficiency challenge only to his murder conviction.  We have exercised our discretion to decide sufficiency issues sua sponte in murder appeals for decades.  Today we announce that we will end that practice beginning with cases docketed to the term of court that begins in December 2020.  The Court will begin assigning cases to the December Term on August 3, 2020.

Our long practice of deciding unraised sufficiency claims has been purely an exercise of discretion; no law requires it.  Over the years, reasons to change course have become clear, and the only real reason to continue our practice is the length of time we have followed it.  That is not enough.

(a) *Sua sponte sufficiency review appears to have begun decades*

*ago in death penalty cases (in which it is now mandated by statute and rule), from which it migrated to non-death penalty murder cases and convictions for offenses other than murder without explanation.*

Some background is helpful to understanding how we reached this point, although a definitive answer appears lost to time. As early as 1968, we reviewed sua sponte the constitutional sufficiency of the evidence as to at least some convictions for which a sentence of death was imposed (although we did not explain why we did so). See *Dixon v. State*, 224 Ga. 636, 637 (1) (163 SE2d 737) (1968) (although no argument was made in death penalty case as to sufficiency of the evidence, and thus the issue was abandoned, "we have studied the evidence and find that it discloses an extremely brutal murder, and that the jury was authorized to find that the defendant was the perpetrator of the crime"). The next year, we again reviewed sua sponte sufficiency in a death penalty case, citing only *Dixon* in stating that we felt "constrained" to do so. *Jackson v. State*, 225 Ga. 790, 794 (7) (171 SE2d 501) (1969) ("While the general grounds of the motion for new trial were technically waived . . . , nevertheless, in a capital felony case such as this one, we feel

constrained to rule on them, even though they have not been properly argued."), reversed in part on other grounds by *Furman v. Georgia*, 408 U. S. 238 (92 SCt 2726, 33 LE2d 346) (1972). And the year after *Jackson*, we did so again. See *Lee v. State*, 226 Ga. 162, 163 (4) (173 SE2d 209) (1970) (citing *Jackson* to examine general grounds, although waived, in case in which death sentence imposed), vacated in part on other grounds by *Lee v. Georgia*, 408 U. S. 936 (92 SCt 2860, 33 LE2d 752) (1972).[8]

But this approach was not consistently applied during the late 1960s and early 1970s; in other cases in which the appellant was sentenced to death, we expressly declined to consider sufficiency where not argued by the appellant. See, e.g., *Johnson v. State*, 226 Ga. 511, 516 (8) (175 SE2d 840) (1970) ("The general grounds and

---

[8] Several of these early instances of sua sponte sufficiency analysis refer only to the "general grounds," which is a term for a broader analysis Georgia law has long empowered trial courts to conduct. See *Wilkerson v. State*, 307 Ga. 574, 575 (837 SE2d 300) (2019) (in exercising its discretion on the "general grounds," the trial judge considers "some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence"). But on appeal, our review of a trial court's decision on the general grounds is limited to sufficiency. See *Lewis v. State*, 296 Ga. 259, 261 (3) (765 SE2d 911) (2014).

other special grounds of the motion for new trial which were not argued will be considered abandoned."); *Alexander v. State*, 225 Ga. 358, 360-361 (5) (168 SE2d 315) (1969) ("While the sufficiency of the evidence to authorize the verdict is raised by other enumerations of error, such question is treated as abandoned inasmuch as the same is not argued by the appellant."). And in other appeals of death penalty cases, we did not address the sufficiency of the evidence. See, e.g., *Lingo v. State*, 226 Ga. 496 (175 SE2d 657) (1970), *Sullivan v. State*, 225 Ga. 301 (168 SE2d 133) (1969), judgment vacated in part by *Sullivan v. Georgia*, 408 U. S. 935 (92 SCt 2854, 33 LE2d 749) (1972).

In 1973, the Georgia legislature enacted Code of 1933, § 27-2537 and essentially codified sufficiency review in all cases in which an appellant had been sentenced to death. See Ga. L. 1973, pp. 159, 165-167, § 4. This new Code section, which is found in its present form at OCGA § 17-10-35, required this Court to review the death sentence imposed for proportionality and other criteria. See Code of 1933, § 27-2537 (c). But it also provided that our review must

include "the factual substantiation of the verdict."  Id. § 27-2537 (i).

Although we did not cite that statutory provision frequently in the years that followed, there is some indication that we viewed the new statute as requiring us to review the sufficiency of the evidence in capital cases.  See *Coley v. State*, 231 Ga. 829, 837 (IV) (204 SE2d 612) (1974) (after setting aside sentence of death for rape, we reviewed the sufficiency of the evidence, saying that doing so was "mandated under the 1973 Death Penalty Statute," despite noting that sufficiency was not argued and "normally would be considered abandoned"); see also *Gregg v. State*, 233 Ga. 117, 118 (1) (210 SE2d 659) (1974) (noting the general grounds were "not argued by the appellant and thus normally [would be] deemed to be abandoned," but nevertheless reviewing the evidence upon those grounds "because of the capital punishment imposed").  During this time, we also conducted sua sponte sufficiency review in capital cases without citing the statute.  See, e.g., *Johnson v. State*, 242 Ga. 649, 650 (250 SE2d 394) (1978) (before addressing enumerations of error, without citing any particular authority requiring sua sponte review,

reviewing evidence and concluding that the evidence authorized the jury to conclude that appellant and another perpetrator were equally involved and thus trial court did not err in overruling motion for new trial).

We also decided appeals in death penalty cases after the 1973 statute without affirmatively stating that we considered sufficiency. See, e.g., *Harris v. State*, 237 Ga. 718 (230 SE2d 1) (1976). But of course the statutorily mandated review of the death sentence in all such cases — including considering whether the sentence "was imposed under the influence of passion, prejudice, or any other arbitrary factor" or was "excessive or disproportionate to the penalty imposed in similar cases"[9] — necessarily involved considerations similar to whether the evidence in fact constitutionally supported a conclusion that the appellant was guilty of a capital offense. See id. at 734 (III) (concluding that the evidence supported the jury's finding of the statutory aggravating circumstance).

A new set of rules governing death penalty cases, promulgated

---

[9] See Code of 1933, § 27-2537 (c) (1), (3) (1973); OCGA § 17-10-35.

in 1980, cemented the requirement that we should review the sufficiency of the evidence in every case in which a death sentence was imposed. That year, the General Assembly mandated further procedures for appellate review of death penalty cases, enacting legislation requiring this Court to establish a uniform procedure for reviewing challenges to convictions and sentences in cases in which the death penalty had been imposed. See Ga. L. 1980, pp. 390, 391-392, § 1. Later that year, we adopted such a procedure for "every case in which the death penalty is sought on an indictment returned after August 15, 1980." 246 Ga. A-1. That Unified Appeal Procedure (UAP) provided that "[i]n all cases the Supreme Court shall determine whether the verdicts are supported by the evidence according to law." 246 Ga. A-16 (UAP IV (B) (2)).[10] This provided additional support for the notion that we must review the sufficiency of the evidence in all death penalty cases. In *Conner v. State*, 251

---

[10] The current version of the UAP includes virtually identical language. See UAP Rule IV (B) (2). But that rule, like all parts of the UAP, "shall be applicable only in cases in which the death penalty is sought." UAP Introduction.

Ga. 113, 114 (1) (303 SE2d 266) (1983), a death penalty case, we reviewed the sufficiency of the evidence sua sponte, explicitly stating that the Unified Appeal Procedure required it. See also *Mincey v. State*, 251 Ga. 255, 255 (1) (304 SE2d 882) (1983) (sua sponte reviewing sufficiency of the evidence in death penalty case, citing UAP).

This shift toward uniform review of the sufficiency of the evidence in cases in which the death penalty had been imposed in the 1970s and 1980s was not automatically followed, however, in cases in which an appellant had received a lesser sentence on a murder conviction. See, e.g., *Brown v. State*, 234 Ga. 632, 634 (2) (217 SE2d 150) (1975) (concluding, in murder case in which a life sentence was imposed, that "appellant did not argue his enumeration of error on the general grounds and it is deemed abandoned"); see also *Gay v. State*, 235 Ga. 240 (219 SE2d 156) (1975) (reviewing sufficiency of evidence as to murder conviction as argued, but deeming any argument as to other conviction abandoned). So far as we can tell, it appears to be the rare 1970s

murder case in which a life sentence was imposed in which we considered the sufficiency of the evidence sua sponte. See *Burnett v. State*, 240 Ga. 681, 689 (12) (242 SE2d 79) (1978) (noting that although we "ordinarily" would consider a sufficiency claim to be abandoned where defendant offered no argument or citation of authority in support of enumeration, "we have thoroughly reviewed the record of the case and find sufficient evidence to support the verdict").

In 1979, the United States Supreme Court made clear that the Due Process Clause of the United States Constitution requires that all criminal convictions must be supported by evidence sufficient to authorize a rational jury to conclude that the defendant is guilty beyond a reasonable doubt of the crimes for which he was convicted and sentenced. See *Jackson*, 443 U. S. at 313-320. At some point thereafter, it appears that we more frequently began conducting sua sponte review of the sufficiency of the evidence to support all of appellants' convictions even in those murder cases in which the death penalty was not imposed. See *Craver v. State*, 246 Ga. 467,

467 (271 SE2d 862) (1980) ("Appellant does not argue the general grounds. However, the evidence is ample to authorize a rational trier of fact to find him guilty beyond a reasonable doubt."). We did not explain why we did so, although we often cited *Jackson v. Virginia*. See, e.g., *Johnson v. State*, 254 Ga. 591, 595 (1) (331 SE2d 578) (1985); *Andrews v. State*, 254 Ga. 498, 500 (4) (330 SE2d 873) (1985); *Craver*, 246 Ga. at 467; *Sutton v. State*, 245 Ga. 192, 193 (3) (264 SE2d 184) (1980). Of course, *Jackson* established the proper standard for considering whether evidence supporting a conviction is sufficient as a matter of due process, but *Jackson* says nothing about whether a waived sufficiency argument must be considered in any particular sort of case on direct review.

Moreover, even post-*Jackson*, this Court did not engage in an explicit sufficiency review in every murder case. See, e.g., *Gibbons v. State*, 253 Ga. 283 (319 SE2d 861) (1984) (no explicit sufficiency review in murder case in which a life sentence was imposed); *Coles v. State*, 253 Ga. 12 (315 SE2d 655) (1984) (same). In short, it is difficult to discern *when* we began reviewing the sufficiency of the

evidence in every murder case, let alone *why* we did so. But it seems clear that it is a practice that began in death penalty cases as an exercise of our discretion, was then codified both in statute and Court rule (again, for death penalty cases only), and then at some point began to carry over without explanation to convictions in murder cases in which the death penalty was not imposed.

(b) *We cannot now identify a compelling reason to retain our current practice of sua sponte review of the sufficiency of the evidence in cases in which the appellant is not sentenced to death, and there are good reasons to abandon that practice.*

Murder now carries a minimum sentence of life in prison with the possibility of parole, a long sentence indeed. But we conduct a sufficiency analysis for all convictions in murder cases, regardless of sentence length, and we do not perform sua sponte sufficiency review in non-murder cases involving life sentences or cases with cumulative sentences exceeding any known life expectancy. See, e.g., OCGA § 16-6-1 (b) (authorizing life imprisonment and life without parole sentences for rape); § 16-8-41 (b) (authorizing life imprisonment sentence for armed robbery); § 16-5-40 (authorizing life imprisonment for kidnapping). For that matter, neither does the

Court of Appeals. Sentence length is not a reason for this practice.[11]

Of course, the requirement that each criminal conviction be supported by sufficient evidence is imposed by the United States Constitution, and failure to satisfy that requirement results in reversal and indeed bars retrial. See *Jackson*, 443 U. S. at 313-320; *Burks v. United States*, 437 U. S. 1 (98 SCt 2141, 57 LE2d 1) (1978); see also *Green v. State*, 291 Ga. 287, 288 (1) (728 SE2d 668) (2012); *Prater v. State*, 273 Ga. 477, 481 (4) (545 SE2d 864) (2001). But reversal of a criminal conviction is also required for the harmful violation of a host of other rules of criminal law; the right to effective assistance of counsel, the right to confront one's accusers, the right to a public trial, and the right against compelled self-incrimination are just a few of the rights secured for criminal defendants by the United States Constitution. And we have no general practice of sua sponte considering whether these other constitutional rights were

---

[11] Our discussion here relates only to murder cases in which a life sentence was imposed. As discussed above, Georgia law requires our sua sponte consideration of several matters in cases in which the death penalty was imposed. See OCGA § 17-10-35; UAP IV (B) (2).

violated.

Finally, some might think that sufficiency should always be reviewed because insufficient evidence is tantamount to actual innocence. But such a view would misunderstand the nature of appellate sufficiency review. When we consider sufficiency, we consider *all* the evidence admitted at trial, regardless of whether the trial court erred in admitting some of that evidence. See *Chavers v. State*, 304 Ga. 887, 891 (2) (823 SE2d 283) (2019); *McDaniel v. Brown*, 558 U. S. 120, 131 (III) (130 SCt 665, 175 LE2d 582) (2010). To understand the significance of this principle, imagine two factually identical cases, in both of which the main evidence is a constitutionally inadmissible video that shows the defendant committing the crime. In the first case, the video was properly excluded from evidence; we conclude that the evidence — without the video — was insufficient. In the second case, the video was erroneously admitted; although on appeal the defendant would have a strong argument to reverse the conviction due to the evidentiary error, we would conclude that the evidence — with the video — was

sufficient.

Due process sufficiency is not at all the same thing as actual innocence. And actual innocence is a claim that Georgia law allows to be brought even when other claims might be subject to certain procedural bars. See *Perkins v. Hall*, 288 Ga. 810, 824 (III) (D) (708 SE2d 335) (2011); *Valenzuela v. Newsome*, 253 Ga. 793, 796 (4) (325 SE2d 370) (1985). Accordingly, any categorical similarity that may appear to exist between sufficiency claims and actual innocence is superficial and cannot justify sua sponte review.

On the other side of the ledger lie several good reasons not to review convictions for sufficient evidence sua sponte. In our view, and with no meaningful countervailing consideration beyond the frequency and duration of our practice, these reasons convince us to change course.

First, and most importantly, our legal system presupposes an adversarial process. See, e.g., *Franks v. State*, 278 Ga. 246, 250 (599 SE2d 134) (2004) (in evaluating claims of ineffective assistance of counsel, "'we are not interested in grading lawyers' performances;

we are interested in whether the adversarial process at trial, in fact, worked adequately'") (quoting *Jefferson v. Zant*, 263 Ga. 316, 318 (431 SE2d 110) (1993) (quoting *White v. Singletary*, 972 F2d 1218, 1221 (11th Cir. 1992))). The adversarial process aligns incentives in a way to increase the likelihood that the strongest possible argument is identified for each side. Although we always strive to decide every issue correctly, we sometimes make mistakes, and the risk of mistakes is at its highest when we consider an issue that no party has briefed or argued. And this is doubly so when the issue is especially record-intensive, as are almost all sufficiency issues. Our un-briefed and thus potentially flawed sufficiency holdings become precedent that stare decisis makes difficult to correct even when the issue is later considered more thoughtfully.

Next is the distinct but related point that we ordinarily should respect strategic decisions by parties and their lawyers about what arguments to assert on appeal. We always are obligated to inquire into our own jurisdiction; parties cannot by agreement confer upon us a power to adjudicate that we do not already possess. See *Jenkins*

*v. State*, 284 Ga. 642, 642 (670 SE2d 425) (2008) ("It is incumbent upon this Court to inquire into its own jurisdiction.") (citation and punctuation omitted); *Foster v. Phinizy*, 121 Ga. 673, 678 (49 SE 865) (1905) ("parties by consent cannot confer jurisdiction upon a court in reference to a matter of which the court has no jurisdiction"). But as to virtually everything else, it is almost always a better course to decide the appeal the parties bring us, rather than the appeal we might have brought were we in counsel's shoes.

Finally, our practice of deciding sua sponte the sufficiency of the evidence supporting every conviction in every murder case consumes a volume of judicial resources far out of proportion to the likely benefit. Direct appeals of cases with murder convictions make up a substantial percentage of this Court's docket; our practice of sua sponte reviewing sufficiency in so many cases consumes a considerable amount of resources but seldom results in a reversal of a conviction. Many reversals that do occur involve only a sentence for a lesser offense that has no practical effect, given that the defendant has also received a sentence of life in prison or life without

parole for the murder.  See, e.g., *Harris v. State*, 304 Ga. 276, 279 (1) (818 SE2d 530) (2018) (reversing convictions and three ten-year concurrent sentences for false imprisonment but affirming sentence of life imprisonment without the possibility of parole for malice murder).  And it is precisely those cases that regularly require an even more disproportionate amount of work to grapple with poorly developed records on issues the parties gave little to no attention in the trial court, where the parties focused their attention on the more serious charges carrying longer sentences.

In short, there are multiple good reasons to change course.  We acknowledge that the decades and thousands of murder appeals in which we have applied this practice is a potential reason to keep it. But as discussed above, this broad practice has never had a solid foundation; although the precise origins of our practice of deciding sua sponte the sufficiency of the evidence for all convictions in murder cases are unclear, they appear to have been rooted in the death penalty, based on a statute that applies only to cases in which the death penalty is sought, and we will continue to review the

sufficiency of murder convictions resulting in the death penalty as that statute requires.

Of course, before we overrule prior precedent without an intervening change in the law, we must consider the doctrine of stare decisis, and the most important stare decisis consideration is the strength of the reasoning of the precedent we are reconsidering. See *State v. Jackson*, 287 Ga. 646, 658 (5) (697 SE2d 757) (2010). But here, we have no holding to overrule, much less reasoning to consider; rather, we simply have developed a practice over time in which we have exercised our discretion in a consistent way. And in the most recent case in which we decided to change course in our exercise of similar discretion, we did so without a consideration of stare decisis. See *Dixon v. State*, 302 Ga. 691, 696-698 (4) (808 SE2d 696) (2017) (abandoning our discretionary practice of sua sponte addressing merger errors that benefit the defendant, without addressing stare decisis considerations). Thus, stare decisis does not stand in the way of the conclusion we reach today.

Nevertheless, the long-standing nature of the practice

counsels in favor of our not ending it without notice. It is conceivable that a lawyer representing a defendant convicted of murder could elect not to raise sufficiency with the expectation that this Court will decide it in any event. To avoid any such reliance, our new approach of not automatically considering sufficiency sua sponte in non-death penalty cases will begin with cases docketed to the term of court that begins in December 2020. The Court will begin assigning cases to the December Term on August 3, 2020. We also note that our new approach does not preclude us from exercising our discretion to consider sufficiency sua sponte where specific circumstances warrant such review. See *Dixon*, 302 Ga. at 696-698 (4).

*Judgment affirmed. All the Justices concur.*

DECIDED JULY 2, 2020.
Murder. Catoosa Superior Court. Before Judge House.
*Jerry W. Chappell II*, for appellant.
*Herbert E. Franklin, Jr., District Attorney, Christopher A. Arnt, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.