310 Ga. 552
FINAL COPY

S20A1353.  HEINZE v. THE STATE.

BETHEL, Justice.

A Glynn County jury found Guy William Heinze, Jr., guilty of the malice murders of Brenda Flanagan, Guy Heinze, Sr., Russell Toler, Sr., Chrissy Toler, Russell Toler, Jr., Michael Toler, Michelle Toler, and Joseph West; the aggravated assault of B. J., a child; and two drug possession offenses. On appeal, Heinze argues only that the trial court erred by improperly removing a juror during deliberations and replacing that juror with the first alternate juror. Seeing no error, we affirm.[1]

---

[1] The crimes occurred on August 29, 2009. On September 14, 2009, a Glynn County grand jury returned an indictment charging Heinze with eight counts of malice murder (Counts 1-8), aggravated assault (Count 9), unlawful possession of a Schedule IV narcotic, propoxyphene (Count 10), and unlawful possession of less than an ounce of marijuana (Count 11). On February 23, 2012, Heinze filed a motion to quash the indictment, alleging that a member of the grand jury that returned the indictment was ineligible to serve due to a felony conviction. On May 23, 2012, a new grand jury returned a second indictment against Heinze charging him with the same offenses. On May 29, 2012, the State filed a notice of intent to seek the death penalty against Heinze. On August 3, 2012, the trial court entered an order of nolle prosequi on the

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Heinze resided in the New Hope community in Glynn County with his father, Guy Heinze, Sr., and several members of the Toler family. In the late summer of 2009, Heinze told a co-worker about a dispute with his father over money that his father planned to give to other members

---

first indictment. Pursuant to that order, the motions and hearings under the first indictment were transferred to the second indictment. On December 3, 2012, pursuant to the Unified Appeal Procedure, Heinze petitioned this Court for interim review of that order and a number of other unrelated rulings. On February 4, 2013, this Court denied interim review. See Case No. S13R0565.

A jury trial was held from October 15 to 25, 2013. During that trial, the death penalty was initially sought by the State, but the State later withdrew its notice of intent to seek the death penalty pursuant to an agreement of the parties. The jury found Heinze guilty on all counts. On October 31, 2013, the trial court sentenced Heinze to life imprisonment without the possibility of parole for each of the eight counts of malice murder (Counts 1-8). The trial court ordered that Counts 1 and 2 run concurrently with each other, that Counts 3 and 4 run concurrently with each other but consecutive to Counts 1 and 2, that Counts 5 and 6 run concurrently with each other but consecutive to Counts 3 and 4, and that Counts 7 and 8 run concurrently with each other but consecutive to Counts 5 and 6. The trial court also sentenced Heinze to a term of twenty years' imprisonment for Count 9 to run concurrently with Counts 1 and 2, a term of five years' imprisonment for Count 10 to run concurrently with Counts 1 and 2, and a term of imprisonment of twelve months for Count 11 to run concurrently with Counts 1 and 2.

Heinze filed a motion for new trial on November 21, 2013, which he amended three times through new counsel. Following a hearing held on December 11, 2018, the trial court denied that motion on February 20, 2020. Heinze filed a notice of appeal directed to this Court on February 21, 2020. Heinze's case was docketed to this Court's August 2020 term, and oral arguments were held on October 20, 2020.

of his family. Heinze said, "Man, my daddy ain't never done nothing for me and my brother. Man, I'm going to kill him, I'm gonna kill 'em all." Heinze had also gotten into a fight with Russell Toler, Jr., about his car and had told his co-worker that he was going to beat Chrissy Toler if she did not arrange a date for him with her friend.

On the morning of August 29, 2009, Heinze's neighbor saw a car arrive at Heinze's home. Five minutes later, the neighbor saw Heinze running from his home, screaming for help and waving his hands. The neighbor and another man met Heinze outside, and Heinze kept screaming "my whole family's dead" and said that it looked like everyone in the home had been beaten to death. At 8:18 a.m., the neighbor called 911. She began speaking with the dispatch official and then handed the phone to Heinze, who began yelling that his family had been beaten to death and that he needed help. The neighbor and the other man later testified that they did not see Heinze bring anything out of his home that morning or put anything into the car parked in front of the home.

While waiting on police to arrive, Heinze went back inside the

home and yelled to his neighbor that Michael Toler was still alive. Police arrived and found Heinze and his neighbor on the home's front steps.[2] Upon entering the home, police determined that there were nine victims inside. Brenda Flanagan, Guy Heinze, Sr., Russell Toler, Sr., Chrissy Toler, Russell Toler, Jr., Michelle Toler, and Joseph West were dead; and Michael Toler and B. J. were seriously injured. Michael Toler later died at the hospital. B. J., who was three years old at the time, survived his injuries.

According to the medical examiner, the victims had been severely beaten, each sustaining head injuries with a blunt, cylindrical object similar in shape to a gun barrel. Russell Toler, Jr., had also been stabbed. The medical examiner testified that each of the victims who were killed had died from the head injuries they sustained. Police found blood spattered throughout the interior of

---

[2] Heinze's dog was tied to a post on the front porch, and he and his neighbor were trying to restrain the dog as police arrived. The neighbor and another witness testified that Heinze's dog regularly barked if anyone came to the home that was not a family member. Both testified that they had not heard the dog bark the night before.

4

the home and blood stains in the areas immediately surrounding the victims' bodies.

The police spoke with Heinze at the scene.[3] Heinze told police that he checked each person in the home for a pulse and discovered that everyone was dead except B. J. and Michael Toler. Heinze stated that he then ran to a neighbor's home to call 911. He also told police that after calling 911 he returned to the mobile home and sat next to Michael Toler until the police arrived.

Police also asked Heinze if there were any weapons kept in the home. Heinze said there was a 20-gauge shotgun in the house and a 16-gauge shotgun in the trunk of the car he had been driving. Heinze told the officer that the gun in his car had been removed from a closet in the bedroom where Michael Toler and Russell Toler, Sr., had been found. Heinze told police that he removed the gun after discovering the victims in the home because the gun had been

---

[3] The officers who interacted with Heinze outside the home testified that Heinze was not under arrest at the time and was not yet a suspect.

stolen.[4] Records established, however, that the 16-gauge shotgun was not stolen. The broken stock of a 20-gauge shotgun was found in the house next to the body of Russell Toler, Sr., but the barrel of that gun was never recovered.

Heinze gave the police permission to look in the trunk of the car. Inside the trunk, the police found the 16-gauge shotgun, which had dried blood on its wooden stock, on the right side of the barrel, and on and around the trigger. The blood belonged to Russell Toler, Sr., and a fingerprint found in the blood stain on the shotgun belonged to Heinze. Inside the car, the police also found a bag of marijuana and a bottle containing propoxyphene pills, a sedative that had been prescribed to Michael Toler. Police also found Michelle Toler's cell phone in the car, which was covered in West's blood.

When he was speaking with police outside the home, Heinze was wearing a polo shirt, khaki shorts (worn over a pair of silver and

---

[4] Officers testified that in order to get to the closet in the home where Heinze said the gun had been stored, Heinze would have had to step over the body of one of the victims who was found dead in that bedroom. The officer testified that the room was in disarray and that there was "a lot of blood" in that room.

black gym shorts), and a pair of sandals. Heinze had no blood on his hands, and although he had scratches on his hands, he was not bleeding. However, there were several blood smears on the bottom of his outer khaki shorts, on the silver and black shorts, and on the tops of his sandals. The blood on Heinze's khaki shorts belonged to Russell Toler, Sr. The blood found on the black and silver shorts belonged to Michael Toler, Russell Toler, Sr., and Chrissy Toler. The blood on the top of his sandals belonged to West and Guy Heinze, Sr.

In the same bedroom where the body of Russell Toler, Sr., was found, police located a document on a night stand with a smear of blood from Russell Toler, Sr., on it. In the blood smear were fingerprints belonging to Heinze. Police also located a knife in the living room of the mobile home that had blood from Russell Toler, Jr., on its tip.

Heinze told police officers that the evening before, he bought cocaine from West and that they then smoked cocaine and marijuana together in the home. However, a toxicology analysis showed that West did not have cocaine or marijuana in his system

7

when he died. Heinze, however, was found to have cocaine, marijuana, and propoxyphene in his system.

Heinze gave varying accounts of his whereabouts on the night the crimes were committed that were contradicted by the testimony of other witnesses. Witnesses who encountered him that evening described him as appearing to be tense and nervous and that he seemed to be under the influence of drugs.

The State's theory was that the evidence showed that Heinze entered the bedroom where Russell Toler, Sr., was sleeping and began fighting with him over pills that belonged to Michael Toler. Next, Heinze killed Toler, Sr., after a struggle, beat Michael Toler after he woke up in the midst of that struggle, then attacked the other victims as they slept in other areas of the home. The State contended that Heinze took money from the home and that the need for money was one of the motives for committing the crimes.[5]

---

[5] The lead detective in the investigation summarized this theory during cross-examination by Heinze's counsel. He further testified that Heinze had $391 in cash in his wallet when he was taken to the police station. In processing the crime scene, Russell Toler, Jr., was found to have $61 in cash in his pocket.

Though not raised by Heinze as error, in accordance with this Court's practice in appeals of murder cases,[6] we have reviewed the record and determined that the evidence, as summarized above, was sufficient to enable a rational trier of fact to find Heinze guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979). See also *Brown v. State*, 302 Ga. 454, 456 (1) (b) (807 SE2d 369) (2017) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence." (citation and punctuation omitted)).

2. Heinze argues that the trial court erred by removing one of the jurors while the jury was deliberating. Because, as explained below, we determine that Heinze affirmatively waived any claim of error in regard to the juror's removal, this enumeration of error fails.

---

No other victims had any money on them, and there was no other money found in the house.

[6] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

The record reflects that, during jury selection, Juror 152, who was a retired federal law enforcement officer, disclosed a relationship between his daughter and the Heinze family. Juror 152 stated that his daughter attended the same school as Heinze, that she was his friend, that she was sad to learn about the killings for which he had been charged, and that she did not "understand how something like that could happen." Juror 152 indicated that his daughter had been afraid when she learned of the killings, but she said that she had never known Heinze to be a violent person. Despite these disclosures, neither party moved to strike Juror 152 for cause or exercised a peremptory strike to remove him. He was seated as a member of the jury.

The jury was sequestered after it was empaneled. The State raised a number of concerns about the conduct and impartiality of Juror 152 during the course of the trial and the first two days of the jury's deliberations and moved three times to have Juror 152

excused.[7] The trial court denied the State's motion each time.

Later, in the early afternoon of the second day of deliberations while Juror 152 remained on the jury, the court was informed that the jury had reached a unanimous verdict as to some counts, but that it was divided nine to three as to other counts. After an inquiry, the trial court determined that the jury was not hopelessly deadlocked and ordered the jurors to continue deliberating. Later that evening, the court was informed that two jurors had concerns about the impartiality of Juror 152 and that there had been a "heated" conflict between Juror 152 and the foreman in the jury room. After bringing the jurors into the courtroom and conferring with the foreman about their progress, the court dismissed the jury

---

[7] The trial court heard testimony that Juror 152 had attempted to discuss the evidence in the case with his wife and with the sheriff's deputy who was chaperoning the jury and that Juror 152 had contacted a detective from another state for advice about how to assess the statements Heinze made to police. Juror 152 testified, however, that he had not expressed any opinion about the case to the other jurors, denied receiving any information in regard to police investigations, and assured the court that he would decide the case based on the evidence presented. Juror 152 later informed the court that his daughter had been present in the courtroom and that Heinze's brother had moved to sit with her. Juror 152 indicated that he was concerned for his daughter's safety. The court informed Juror 152 that the issue had been "taken care of."

11

for the evening.

The next morning, the trial court was notified that the parties had reached an agreement. The State announced to the court that it agreed to withdraw its notice of intent to seek the death penalty against Heinze and seek a maximum sentence of life or life without parole on any of the counts for which Heinze might be found guilty. In return, Heinze agreed that Juror 152 would be excused from the jury and replaced by the first alternate juror. The parties agreed that the jurors would be brought back to the courtroom and instructed that a juror had been removed and replaced by the first alternate, and that they were to restart their deliberations as to each count in the indictment. The parties also agreed that the jury would not be informed that the death penalty was no longer available as a possible sentence.

The trial court asked Heinze's three attorneys individually if the State had accurately presented the terms of the mutually agreed-upon deal. They each agreed that the State's representations were accurate. The trial court then asked Heinze about the

12

agreement:

> COURT: Mr. Heinze, have you had an opportunity to speak with your team about the agreement?
> HEINZE: Yes, Your Honor.
> COURT: And do you need some more time with them or are you ready for me to ask you whether or not that's your agreement?
> HEINZE: I'm fine.
> COURT: Okay. So, you're okay. All right. And you agree with it? Do you have any questions about it?
> HEINZE: No.
> COURT: All right.

The trial court then accepted and enforced the agreement of the parties by removing Juror 152, substituting the first alternate juror onto the jury, and instructing the jury to restart its deliberations. The jury returned a unanimous guilty verdict on each count of the indictment later that afternoon.

At the hearing on Heinze's motion for new trial, Heinze's lead trial counsel testified that the defense team participated in negotiations to remove Juror 152 and that Heinze was consulted and advised before the attorneys agreed to anything with the State. Counsel testified that he and the other attorneys had "several hours" to talk with Heinze before agreeing to the deal with the State.

13

Heinze now argues that, by accepting the parties' agreement, the trial court violated OCGA § 15-12-172[8] because it did not have the authority under that Code section to remove Juror 152. Heinze also argues that the removal of Juror 152 deprived him of his right to a fair and impartial jury and deprived Juror 152 of his right to serve as a juror. He also claims that the trial court's questioning of Heinze about the agreement was inadequate to determine whether Heinze knowingly and intelligently waived his right to have Juror 152 on the jury.

However, as Heinze conceded at oral argument, by agreeing to the removal of Juror 152 in exchange for the State's agreement to withdraw its notice of intent to seek the death penalty against him,

---

[8] OCGA § 15-12-172 provides, in relevant part:
> If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated. . . . An alternate juror taking the place of any incapacitated juror shall thereafter be deemed to be a member of the jury of 12 and shall have full power to take part in the deliberations of the jury and the finding of the verdict. Any verdict found by any jury having thereon alternate jurors shall have the same force, effect, and validity as if found by the original jury of 12.

Heinze invited the trial court's actions and therefore affirmatively waived any claim of error regarding the removal of Juror 152. See *Wallace v. State*, 303 Ga. 34, 37 (2) (810 SE2d 93) (2018) (appellant invited alleged error by urging the trial court to dismiss a holdout juror). The record clearly shows that Heinze consulted with his attorneys before entering into this agreement. Moreover, the trial court questioned Heinze as to his knowledge and understanding of the agreement and whether he had consulted with his attorneys about the agreement, and the trial court gave Heinze an opportunity to ask questions about the agreement. Heinze has pointed to no authority suggesting that the trial court was even required to make these inquiries of Heinze personally in order to remove Juror 152 pursuant to the mutual agreement of the attorneys for the parties. See, e.g., id. (holding that the appellant affirmatively waived a challenge to the replacement of a juror with an alternate because his trial counsel urged the trial court to dismiss the juror, without any colloquy with the appellant personally). Moreover, Heinze has not asserted or presented any evidence as to anything relating to the

15

agreement that he did not know about or understand at the time he entered into it. This enumeration of error fails.

*Judgment affirmed. Melton, C. J., Nahmias, P. J., and Boggs, Peterson, Ellington, and McMillian, JJ., concur. Warren, J., not participating.*

DECIDED DECEMBER 7, 2020.
Murder. Glynn Superior Court. Before Judge Scarlett.
*Richard O. Allen*, for appellant.
*Jacquelyn L. Johnson, District Attorney, Thomas E. Buscemi, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.