303 Ga. 496
FINAL COPY

S18A0263.  JONES v. THE STATE.

GRANT, Justice.

Jahbari Jones ("Jones") appeals his convictions for malice murder and theft by taking in connection with the shooting death of his cousin, Tradae Jones.  Jones contends that the evidence was insufficient to sustain his convictions and that the trial court erred in instructing the jury during the separate trial on the issue of Jones's mental competency, in excluding statements Jones made to police by telephone after the shooting and before his arrest, and in not including the lesser offenses of voluntary manslaughter and involuntary manslaughter on the verdict form.  We disagree, and therefore affirm.[1]

---

[1]    Tradae was killed on November 3, 2009.  On October 20, 2011, Jones was indicted by a Cobb County grand jury for malice murder (Count 1), felony murder based on aggravated assault (Count 2), felony murder based on unlawful possession of a firearm (Count 3), aggravated assault by brandishing a shotgun at Tradae (Count 4), unlawful possession of a firearm (the sawed-off shotgun) (Count 5), and theft by taking automobile (Count 6).  After a separate jury trial on the issue of Jones's competency to stand trial, in which the jury found against Jones's special plea of incompetency, a jury trial on the charges in the indictment was held on June 11-15, 2012.  The jury found Jones not guilty

I.

Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. At the time of Tradae's death, Jones and Tradae lived with other family members, including Jones's mother, Cassandra Jones, and Tradae's mother, Sheri Adebayo, in a house in Marietta, Georgia. Late in the afternoon on November 3, 2009, while Tradae was out with his girlfriend, Cassandra noticed that her CD player was missing. She became upset and said that Tradae had stolen it. Jones also became upset; Adebayo called Tradae, and Jones angrily accused him of stealing the CD player. Tradae denied stealing the CD player and said he was heading home.

After the phone call with Tradae, Jones went out to a shed in the back yard and got a sawed-off shotgun that belonged to Tradae. Jones's brother, Aderami "Remi" Jones, went out to the shed and saw Jones holding the

on Counts 3 and 5, but guilty on the remaining counts of the indictment. The trial court sentenced him to life imprisonment for malice murder and ten years concurrent for theft by taking automobile. Count 2 was vacated, and Count 4 merged with the murder conviction for sentencing. Jones filed a timely motion for new trial on July 3, 2012, which was amended on June 25, 2015, after the appearance of new counsel. The motion for new trial was denied on August 11, 2017, and Jones filed a notice of appeal on August 31, 2017. The appeal was docketed to the term of this Court beginning in December 2017 and scheduled for oral argument on February 6, 2018, at the State's request. The State subsequently withdrew its request for oral argument, with Jones's consent, and the appeal was submitted for a decision on the briefs.

shotgun. Jones was visibly upset and angry. When Remi asked Jones what he was going to do with the gun, Jones responded, "What do you think?" Later that afternoon, Remi went back out to the shed and continued to press Jones about what he was planning to do, finally asking if Jones was going to shoot Tradae. Jones answered, "Yeah." Tradae's mother Adebayo also encouraged Jones to let the matter drop, emphasizing that the two men were cousins and the CD player was not valuable, but Jones responded, "No, auntie, I got something for Tray [referring to Tradae] this time."

When Tradae returned to the house with his girlfriend, Jones ran out to meet him, and the two argued in the front yard. Tradae suggested they take the argument to the back yard, and Jones agreed. Jones went through the house and out to the shed. Tradae went around the side of the house and, when Jones emerged at the door of the shed holding the shotgun, Tradae approached him saying, "So you're going to shoot me bra? You're going to shoot me?" Jones pointed the shotgun at Tradae, and Tradae grabbed the barrel and pointed it at his own chest. The two continued to argue and after a minute, Jones's arm moved back and forth as though operating the pump action. The shotgun discharged, and the shot blew a hole in the left side of Tradae's chest, obliterated the base of his heart, and penetrated his diaphragm and liver.

Tradae's hands were not touching the shotgun when it discharged. Tradae nonetheless continued to stand, and after a moment, Jones knocked him out of the way with the gun and fled. Tradae died from the gunshot wound within a couple of minutes after the shooting, despite the efforts of his mother and his girlfriend to resuscitate him.

Jones threw down the gun, ran around the side of the house, and jumped over the fence. He got into Tradae's girlfriend's Ford Explorer, which was parked in the driveway. She tried to hang onto the door of the Explorer, but Jones backed out and drove away. He was arrested several hours later in Tennessee, after leading police on a high-speed chase in the Explorer.

Georgia Bureau of Investigation firearms examiners tested the shotgun used to shoot Tradae and found that it functioned normally. A trigger pull test was performed and showed that an average of 7.75 pounds of force was required to pull the trigger, a typical value for that type of gun—not a "hair trigger," in other words. The weapon also had a trigger guard. There was no indication that simply knocking or bumping into the shotgun could have fired it. Moreover, the weapon was a pump-action shotgun, meaning that it must be pumped in order to chamber a shell before it can be fired. And Jones's own expert in forensics and crime scene investigation, while also opining that the

gun could have discharged accidentally if Tradae had jerked the gun back while Jones's finger was on the trigger, conceded that the evidence was also consistent with an intentional trigger pull.

## II.

Jones contends that the evidence introduced at trial was insufficient to permit the jury to find him guilty beyond a reasonable doubt of the crimes of which he was convicted. Specifically, he argues that the verdicts were "decidedly and strongly against the weight of the evidence" and "contrary to law and the principles of justice and equity." That, however, is not the relevant standard for sufficiency of the evidence on appeal. Rather, that is the standard that trial judges apply when deciding a motion for new trial on the "general grounds" set out in OCGA §§ 5-5-20 and 5-5-21. See *Smith v. State*, 300 Ga. 532, 534 (796 SE2d 671) (2017) (decision on a motion for new trial on the "general grounds" set out in OCGA §§ 5-5-20 and 5-5-21 is solely within the discretion of the trial court). When the sufficiency of the evidence is raised on appeal, this Court's review is limited to an evaluation of whether the evidence, viewed in the light most favorable to the verdicts, is sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Jones was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307,

318-319 (99 SCt 2781, 61 LE2d 560) (1979); *Nichols v. State*, 292 Ga. 290, 290 (736 SE2d 407) (2013). Here, the evidence easily meets that standard.

To prove the crime of malice murder, the State was required to present evidence showing that Jones acted with express or implied malice in killing Tradae. See OCGA § 16-5-1 (a). Jones argues that the evidence supported his defense that the shooting was accidental, pointing to testimony by his brother Remi that Jones said before the argument that he did not know if the shotgun was loaded. But there was ample evidence to support a finding that Jones deliberately fired the shotgun with the specific intent to kill Tradae, including evidence that Jones was angry about the stolen CD player, went out to the shed to get the shotgun before Tradae arrived home, told his aunt that he had "something for Tray this time," told his brother Remi that he planned to shoot Tradae, deliberately pointed the shotgun at Tradae, and worked the pump to chamber a shell while the two continued to argue. Even if there were not evidence of specific intent to kill, which there was here, malice may also be inferred by conduct which demonstrates "such a reckless disregard for human life as to show an abandoned and malignant heart." *Bozzie v. State*, 302 Ga. 704, 706 (808 SE2d 671) (2017) (citation and punctuation omitted). Accordingly, and at the very least, the jury was authorized to find that Jones

acted with reckless disregard for human life by pointing the shotgun at Tradae and, after Tradae grabbed the barrel of the gun and pointed it directly at his own chest, working the pump action to chamber a shell. It is the jury's role rather than this Court's to resolve any conflicts in the evidence, and "the resolution of such conflicts adversely to the defendant does not render the evidence insufficient." *Graham v. State*, 301 Ga. 675, 677 (804 SE2d 113) (2017) (citation and punctuation omitted).

Any challenge to the sufficiency of the evidence supporting Jones's theft conviction also fails. Theft by taking is committed when a person unlawfully takes the "property of another with the intention of depriving him of the property." OCGA § 16-8-2. Evidence admitted at trial showed that Jones drove away from the scene of the shooting in Tradae's girlfriend's Ford Explorer without her permission and despite her attempts to stop him. Jones drove the Explorer to Tennessee, and was still in possession of the vehicle when he was apprehended after a high-speed chase. In short, the evidence summarized above was legally sufficient to support the jury's finding beyond a reasonable doubt that Jones was guilty of the crimes of which he was convicted and sentenced. See *Jackson*, 443 U. S. at 318-319; *Clark v. State*, 283 Ga. 234, 235 (657 SE2d 872) (2008).

## III.

Jones also contends that the trial court erred by failing to give his requested instruction on the form of the verdict in his separate trial on the issue of mental competency.  On that issue, the trial court gave the following instruction:

> Upon your consideration of this case, under all of the evidence and all of the instructions that the [c]ourt has given you, if you find in favor of the defendant's special plea of insanity, the form of your verdict would be: We, the jury, find in favor of the special plea of defendant. In the event under all of the evidence and all of the instructions given to you by the [c]ourt you find against the special plea of insanity that has been filed by the accused, the form of your verdict will be:  We, the jury, find against the special plea of insanity.
> There has been a verdict form prepared, and it says verdict on special plea of incompetence to stand trial. It has those two verdict forms. If you find in favor of the special plea of incompetency, you would check the first form. If you find as to the — against the special plea of incompetency to stand trial, you would check the second form. Then there is are [sic] a place for the date and the signature of the foreperson and a request that the foreperson print their name.
> If you find that Jahbari Jones is mentally competent to stand trial and you rule against the special plea of mental incompetence, then the case in which he is charged with a criminal offense will be tried before another jury. You would not try that case. In the event that you find that the [d]efendant is not mentally competent to stand trial and you rule in favor of the special plea, then the trial would be postponed until the defendant is later found to be mentally competent to stand trial.

The first and third paragraphs of this instruction substantially followed the pattern jury charge requested by the State.[2] The verdict form submitted to the jury was entitled, "Verdict on Special Plea of Incompetency to Stand Trial," and included two options: "We, the Jury, find in favor of the Special Plea of Incompetency to Stand Trial" or "We, the Jury, find against the Special Plea of Incompetency to Stand Trial."

Jones's requested instruction was almost identical to the State's request for the pattern charge and also very similar to the charge given by the court, except that Jones's version replaced the term "special plea of insanity" in the first paragraph with the term "special plea of mental incompetence." During the charge conference, the trial court commented that the jury instructions submitted by the parties were all identical, except for one additional instruction requested by Jones (and opposed by the State) to flesh out the definition of

---

[2]  The differences from the pattern instruction were that the trial court omitted the word "that" in two locations; said "special plea of defendant" instead of "special plea of insanity" in the first paragraph; and inserted the second paragraph above (to which neither party objected) discussing the specific verdict form that would be submitted to the jury. See Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 3.90.30 (2011). The pattern instruction has since been amended so that it refers to whether the defendant is "competent to stand trial" rather than to the "special plea of insanity." While that change reflects an improvement in the charge, it does not establish that any use of the pattern charge prior to its amendment constituted an error.

mental competence.  The court gave that instruction as requested, and no party challenges it on appeal.  Jones did not point out the differences in his requested verdict form charge during the charge conference, but brought the matter to the court's attention after the trial court instructed the jury using the pattern charge as requested by the State.  When the time came for objections to the charge as given, Jones pointed out that his requested charge had used the term "mental incompetence" throughout "to match the plea and the verdict form."  He asked that the court advise the jurors that any time the word "insanity" was used in the charge, the words "mental incompetence" could be substituted, but did not explain why; the trial court declined this request.  Jones did not, however, make the specific objection that he now raises on appeal; that is, that the use of the terms "insanity" and "mental incompetence" interchangeably made the instruction misleading or confusing, so that it was not clearly comprehensible to a lay person.

Because Jones failed to "inform the court of the specific objection and the grounds for such objection" to the jury charge as given, we review his claim on appeal only for plain error.  OCGA § 17-8-58; see *Scott v. State*, 302 Ga. 29, 30-31 (805 SE2d 40) (2017).  To show plain error, Jones must establish not only that the instruction was erroneous and that the error was not affirmatively

waived, but also that the error "was obvious beyond reasonable dispute, likely affected the outcome of the proceedings, and seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Saffold v. State*, 298 Ga. 643, 650 (784 SE2d 365) (2016) (citation and punctuation omitted).

We review jury charges as a whole to determine whether there is error. *Williams v. State*, 298 Ga. 208, 217 (779 SE2d 304) (2015). Here, the trial court gave all of Jones's requested instructions with the exception of the instruction at issue, which was nearly identical to the charge given. The trial court charged the jury that Jones could not be tried for criminal offenses "while in a condition of mental incompetence or insanity," and that the question for their determination was whether Jones was "capable of understanding the nature and object of the proceedings, understanding the accused's own situation in reference to such proceedings, and giving the attorney representing the accused such assistance as a proper defense to the charges demands." The court provided additional instructions on the meaning of mental competence, Jones's burden of proof, the credibility of witnesses, and how to complete the verdict form.

Viewed as a whole, the charge was not misleading or confusing, and was sufficient to inform the jury as to the question for their determination and the

factors comprising the legal test for competence to stand trial. We find no reversible error. See *Carter v. State*, 257 Ga. 510, 512 (361 SE2d 175) (1987) (jury charge using the word "insanity" in mental competency trial did not amount to reversible error where charge as a whole, which included correct test to apply in determining mental competence to stand trial, was proper); *Huckabee v. State*, 287 Ga. 728, 733 (699 SE2d 531) (2010) ("A trial court's refusal to give a jury charge in the exact language requested by a defendant is not error if the charge given by the trial court substantially covers the applicable principles of law.") (citation and punctuation omitted). Finally, because the jury charge as a whole clearly and correctly informed the jury regarding the issue to be decided and the meaning of the term "incompetency to stand trial" as used on the verdict form, it is highly unlikely that the instruction at issue affected the outcome of the proceeding.[3] Although we need not consider all of the plain error factors once even one is not met, it is of course also clear that the instruction did not "seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings." *Saffold*, 298 Ga. at 650 (citation and punctuation omitted). Because Jones has failed to make the

---

[3]     We note that Jones's charge requests also included at least one charge that used the terms "insanity" and "mental incompetence" interchangeably.

required showing on any of the four prongs of the plain error test, his claim on this issue is without merit. See *Carruth v. State*, 290 Ga. 342, 348 (721 SE2d 80) (2012).

## IV.

Jones next contends that the trial court committed reversible error by excluding statements that he made to police by telephone several hours after the shooting, in which he claimed that the shotgun had accidentally gone off when Tradae grabbed it. Jones argues that because he made the statements to police while still driving the Explorer, the statements were relevant to explain his state of mind and were admissible as part of the res gestae. At the time of Jones's trial, OCGA § 24-3-3 provided that "[d]eclarations accompanying an act, or so nearly connected therewith in time as to be free from all suspicion of device or afterthought, shall be admissible in evidence as part of the res gestae." We review a trial court's decision on the admissibility of such evidence only for an abuse of discretion. See *Pierce v. State*, 302 Ga. 389, 391 (807 SE2d 425) (2017); *Sharpe v. State*, 291 Ga. 148, 150 (728 SE2d 217) (2012).

Generally, whether a statement is part of the res gestae depends on a number of factors, including "the timing of the statement, whether the

declarant was able to deliberate about the statement, and whether the declarant was influenced by others prior to making the statement." *Hites v. State*, 296 Ga. 528, 531 (769 SE2d 364) (2015). Here, Jones's statements were made several hours after the shooting—after Jones had spoken with family members and had time to consider how best to explain the shooting. The statements were not made either at the time of the shooting or so soon afterward "as to be free from all suspicion of device or afterthought," and were not, therefore, admissible as part of the res gestae. Moreover, under the former Evidence Code in effect at the time of trial, where a defendant chose not to testify at trial and subject himself to cross-examination, his self-serving statements generally were inadmissible hearsay. See *Sharpe*, 291 Ga. at 150 ("While a defendant is allowed to declare his innocence in open court, he is not allowed to avoid this opportunity by 'pre-trial declarations of innocence.'" (quoting *Parker v. State*, 276 Ga. 598, 598 (581 SE2d 7) (2003))). We find no abuse of discretion in the trial court's exclusion of Jones's self-serving statements.

V.

Last, Jones contends that the trial court erred in rejecting his request to include separate lines on the verdict form for voluntary manslaughter and involuntary manslaughter as lesser offenses of malice murder and felony murder. Instead, the trial court used a verdict form that provided a blank line next to each count of the indictment, and instructed the jury to write in its verdict on each count in the space provided. The court also instructed the jury on the lesser offenses of voluntary manslaughter and involuntary manslaughter, and provided clear and detailed instructions on how to complete the verdict form whether the jury found Jones not guilty, guilty of either of the lesser offenses, or guilty of the offense charged.

During deliberations, the jury sent out a note asking if voluntary manslaughter and involuntary manslaughter fell under malice murder, and the trial court recharged the jury that those were lesser offenses of both malice murder and felony murder. Later, the jury sent another note advising the court that it had reached a verdict on all counts except Count 1, and that one juror believed it should be voluntary manslaughter. The trial court responded to the second note by instructing the jury, with the consent of both parties, to continue deliberating.

There is no error in providing a verdict form that requires the jury to write its verdict on each count by hand, as long as the form is accompanied by appropriate instructions related to the charges and how the verdict should be entered on the form. See *Chapman v. State*, 258 Ga. 214, 217 (367 SE2d 541) (1988) (safer practice is to omit preprinted terms "guilty" and "not guilty" and require the jury to complete the verdict form by hand). Viewed in conjunction with the jury instructions as a whole, the verdict form used in this case would not mislead jurors of reasonable understanding, and there is no indication in the record that the jurors had any difficulty completing the verdict form according to the court's instructions. See *Drake v. State*, 288 Ga. 131, 134 (702 SE2d 161) (2010) ("Qualified jurors under oath are presumed to follow the instructions of the trial court."). The jury's request for clarification was adequately addressed by the court's recharge on the lesser offenses, and the jury's later note advising the trial court that one juror believed the verdict on Count 1 should be voluntary manslaughter did not indicate any remaining confusion about the verdict form; to the contrary, it showed that the jury understood that it could find Jones guilty of voluntary manslaughter on Count 1. Finally, because the court appropriately instructed the jury on the lesser offenses of voluntary and involuntary manslaughter, it was not error to fail to

include them on the verdict form.  See *Leeks v. State*, 296 Ga. 515, 522 (769

SE2d 296) (2015); *Buttram v. State*, 280 Ga. 595, 599 (631 SE2d 642) (2006);

*Brinson v. State*, 276 Ga. 671, 674 (581 SE2d 548) (2003).

Judgment affirmed.  All the Justices concur.

Decided April 16, 2018.

Murder. Cobb Superior Court. Before Judge Poole.

Louis M. Turchiarelli, for appellant.

D. Victor Reynolds, District Attorney, Michael S. Carlson, John R. Edwards, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew B. Crowder, Assistant Attorney General, for appellee.