310 Ga. 246
FINAL COPY

S20A1019. ATKINS v. THE STATE.

ELLINGTON, Justice.

A jury found Brian Atkins guilty of felony murder predicated on aggravated assault and possession of a firearm in connection with the shooting death of Brian Parks.[1] On appeal, Atkins contends that the evidence was insufficient to prove that he assaulted Parks with a deadly weapon, that the trial court erred in excluding an unavailable witness's out-of-court statement, and that the verdict form was misleading. For the reasons explained below, we affirm.

---

[1] The shooting occurred on October 18, 2016. A McDuffie County grand jury returned an indictment on June 13, 2018, charging Atkins with malice murder (Count 1), felony murder predicated on aggravated assault (Count 2), aggravated assault with a deadly weapon (Count 3), and possession of a firearm during the commission of a felony (Count 4). At a September 2018 jury trial, Atkins was found not guilty on Count 1 and guilty on the remaining counts. By judgment entered on September 19, 2018, the trial court sentenced Atkins to serve life in prison for felony murder (Count 2) and five years in prison for the firearms charge (Count 4) to run consecutively. Count 3 merged with Count 2. Atkins filed a timely motion for a new trial. After a hearing on January 8, 2020, at which Atkins was represented by new counsel, the trial court denied the motion for a new trial on February 7, 2020. Atkins filed a timely notice of appeal, and his appeal was docketed in this Court to the April 2020 term and submitted for a decision on the briefs.

Viewed in the light most favorable to the jury's verdicts, the evidence presented at Atkins's trial shows the following. The shooting took place in Leslie Hampton's apartment, where both Atkins and Parks had been living for a few months. Hampton testified that, before she left for work at about 1:00 p.m., Terry Thomas and Montavis Williams were hanging out in the apartment with Atkins and Parks, listening to music. Hampton testified that she saw a weapon and told Thomas to remove the weapon from her home. Thomas agreed to take care of it, and Hampton left for work.

Jada Lawson, who was friends with Hampton, Atkins, and Parks, testified as follows. She went to the apartment after work that evening and watched a movie with Atkins, Parks, Thomas, and Williams. Lawson went to take a shower. At that point, Parks was in his bedroom, and Atkins was sitting at the table in the kitchen area. About five minutes into her shower, Lawson heard a gunshot. She turned off the shower, wrapped herself in a towel, and went to check. She found Atkins facing the front door, which was open, and Parks lying on the floor in the living room, near the television. Parks

said, "Jada, call 911. [Atkins] just shot me." Atkins turned toward her and said, "I didn't mean to; it was an accident; I didn't know it was loaded." Lawson told Atkins to get her cell phone, and he called 911[2] while she knelt beside Parks and held his hand.

Markeshika Hart testified that six weeks before the shooting she went on a trip to Myrtle Beach for Labor Day with a group of family and friends that included Atkins and Parks. Hart testified that Atkins and Parks got into a fight that weekend after Parks criticized Atkins's treatment of a girl Atkins was dating. Hart testified that Atkins hit Parks in the face twice. Although Parks initially tried to brush off Atkins's provocation, Hart urged Parks to fight back, and a brief scuffle ensued. Parks then went to leave the hotel room, and Atkins said he would throw Parks off the balcony.

A GBI agent testified that, in an interview about four hours after the shooting, Atkins told investigators that Parks left the apartment to go to a bootleggers' place to get a cigarette and that, while Parks was gone, Atkins heard one or two gunshots, went

---

[2] The 911 call was received at 9:55 p.m.

3

outside and found Parks with a gunshot wound, and helped him up the stairs to the apartment where Atkins immediately called 911. Atkins told the investigators that, the day before the shooting, the cigarette bootleggers had been texting him that they were going to kill Parks because he had something to do with their place being robbed. But when investigators challenged Atkins to explain why his story did not match what other people had said and what the crime scene revealed, Atkins changed his story and said that Thomas and Williams had been at the apartment playing with a gun and ejecting the bullets one after another; Atkins, who was sitting on the couch, asked to see the gun, believing the bullets were all out; and, as soon as the gun was in his hand, it went off and a bullet hit Parks, who had just walked into the room. Atkins told the investigators that, after the shooting occurred, Thomas took the gun from him, and Thomas and Williams collected all the bullets and left the apartment before the police arrived. An audio recording of the 45-minute long interview was played for the jury. Neither Williams nor Thomas, who were charged with and pleaded guilty to

tampering with evidence in connection with the shooting by removing the gun and some of the bullets, testified. The trial court excluded Williams's pretrial statements, and Atkins opted not to present Thomas's pretrial statement.

The forensic evidence included the following: a single .32-caliber bullet that was retrieved from Parks's body; a finding from the autopsy that the bullet entered Parks's chest above the left nipple, traveled through the third rib and slightly downward to lodge in the sixth thoracic vertebra; a .32-caliber shell casing found in front of the couch in the apartment; and an unfired .32-caliber cartridge found on the floor under a couch cushion.

Atkins did not testify or present any witnesses or documentary evidence.

1. Atkins contends that there was no evidence that Parks was in reasonable apprehension of injury and, therefore, the evidence did not support the charge of aggravated assault, the predicate to the felony murder charge. Specifically, he argues that there was no evidence that Parks thought the gun was loaded or even that he saw

the gun before it fired. Atkins contends that his conviction for felony murder must therefore be reversed.

In Count 3, the indictment charged Atkins with "mak[ing] an assault upon the person of Brian Parks with a deadly weapon, to wit: a certain firearm[.]" See OCGA § 16-5-21 (a) (2) ("A person commits the offense of aggravated assault when he or she assaults . . . [w]ith a deadly weapon[.]"). The Code provides two methods of committing an assault: "either [by] [a]ttempt[ing] to commit a violent injury to the person of another; or [by] [c]ommit[ting] an act which places another in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a). The trial court instructed the jury as to both methods of committing an assault. If the evidence was sufficient for the jury to find beyond a reasonable doubt that Atkins committed the offense by one method, the State was not required to also prove that he committed the offense by the alternative method. See *Cash v. State*, 297 Ga. 859, 862 (2) (778 SE2d 785) (2015); *Chase v. State*, 277 Ga. 636, 638 (1) (592 SE2d 656) (2004). Thus, if the evidence was sufficient for the jury to find

6

beyond a reasonable doubt that Atkins attempted to inflict a violent injury upon Parks, the State was not required to also prove that Parks had any apprehension of receiving a violent injury.

We conclude that the evidence, though circumstantial, authorized the jury to find that Atkins attempted to inflict (and succeeded in inflicting) a violent injury upon Parks. That evidence includes the angry encounter Atkins had with Parks six weeks before the shooting when he threatened to throw Parks off a balcony; Parks's statement before he died that Atkins shot him; Atkins's failure to call 911 immediately after the shooting; Atkins's initial false statement that Parks was shot outside of the apartment the day after bootleggers threatened to kill him; and the inconsistency between Atkins's statement that he was sitting on the couch when Parks walked into the room and the gun went off and the forensic evidence showing that the fatal bullet followed a downward trajectory through Parks's chest. The evidence was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Atkins was guilty of aggravated assault. See *Jackson v.*

7

*Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). The evidence was also legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Atkins was guilty of felony murder predicated on aggravated assault and possession of a firearm during the commission of a felony. See id.[3]

2. Atkins contends that the trial court erred in refusing to admit Williams's out-of-court statements that the shooting was an accident. He argues that the statements qualified as excited utterances because Williams was still under the stress of the shooting. In the alternative, he argues that Williams's statements were admissible under the residual exception to the hearsay rule and that the trial court applied the wrong standard when it excluded the statement because it lacked "exceptional guarantees of trustworthiness."

After the State rested, Atkins's counsel informed the trial court

---

[3] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, 309 Ga. 383, 392 (4) (846 SE2d 83) (2020). The Court began assigning cases to the December term on August 3, 2020.

that he had been unable to locate Williams and did not anticipate being able to call him as a witness, but that he intended to call other witnesses, two of whom he identified by name, to testify that they heard Williams say that the shooting had been an accident. Defense counsel argued that Williams's statements were admissible as excited utterances and under the residual hearsay exception. Counsel admitted that the witnesses could not give "an accurate time" when the statements were made but argued that the witnesses stated that they saw Williams

> freaking out over what had happened, very nervous, running in and out of the house, and actively trying to avoid police with Terry Thomas. . . . So this is not a delayed matter, this happened that night . . . in the immediate aftermath of the shooting . . . when [he was] running from the police.

As for indicia of reliability for the residual exception, counsel argued that "multiple witnesses who [were] not connected to these families and [were] not connected to these events" said that Williams "said the same thing in the aftermath" of the shooting. Counsel did not elaborate on how the witnesses knew Williams or proffer their

9

testimony.

The trial court sustained the State's objection to Williams's statements, based on the lack of evidence about the amount of time that elapsed between the shooting and the statements, which it deemed "a critical component" of the excited utterance exception, and on the lack of "exceptional guarantees of trustworthiness" that are required under the residual hearsay exception.

"[A] trial court's decision whether to admit or exclude evidence will not be disturbed on appeal absent an abuse of discretion." *Lyons v. State*, 309 Ga. 15, 21 (4) (843 SE2d 825) (2020). The excited utterance exception provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" shall not be excluded by the hearsay rule. OCGA § 24-8-803 (2).

> [T]he basis for the excited utterance exception to the hearsay rule is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination

10

would be superfluous.

*Jenkins v. State*, 303 Ga. 314, 317 (2) (812 SE2d 238) (2018) (citation and punctuation omitted). Whether a hearsay statement was an excited utterance is determined by the totality of the circumstances. *Robbins v. State*, 300 Ga. 387, 389-390 (2) (793 SE2d 62) (2016). The critical inquiry is "whether the declarant is still in a state of excitement resulting from that event when the declaration is made. And in that regard, even a brief period of time can provide a declarant an opportunity to couch a statement in such a way as to best serve his interests." *Jenkins*, 303 Ga. at 318 (2) (citations omitted). Here, Williams, who admittedly was involved in tampering with the crime scene immediately after the shooting, allegedly made the statements while actively avoiding being found by the police. We conclude that the trial court did not abuse its discretion in rejecting Atkins's excited utterance argument because the circumstances did not eliminate the possibility of fabrication.

The residual hearsay exception, set out in OCGA § 24-8-807[4], is

> to be used very rarely and only in exceptional circumstances, and only when there exists certain *exceptional guarantees of trustworthiness* and high degrees of probativeness and necessity. . . . A trial court's decision to admit [or exclude] hearsay evidence under Rule 807 is reviewed for an abuse of discretion. This Court is particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors.

*Davenport v. State*, 309 Ga. 385, 390 (3) (846 SE2d 83) (2020) (citations and punctuation omitted; emphasis supplied). Such guarantees of trustworthiness

> must be equivalent to cross-examined former testimony, statements under a belief of impending death, statements

---

[4] OCGA § 24-8-807 provides:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
>
> > (1) The statement is offered as evidence of a material fact;
> >
> > (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
> >
> > (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

against interest, and statements of personal or family history. These categories of hearsay have attributes of trustworthiness not possessed by the general run of hearsay statements that tip the balance in favor of introducing the information if the declarant is unavailable to testify. And they are all considered sufficiently trustworthy not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made.

*Jacobs v. State*, 303 Ga. 245, 249 (2) (811 SE2d 372) (2018) (citations and punctuation omitted).

Contrary to Atkins's argument, the trial court's reference to "exceptional guarantees of trustworthiness" did not show that the trial court was applying an incorrect standard. Even if Williams told multiple, allegedly independent witnesses that the shooting was an accident, Atkins has not shown that such repetition is a guarantee of trustworthiness equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, or statements of personal or family history. Consequently, the trial court did not abuse its discretion in excluding Williams's statements.

3. Atkins contends that the trial court used a verdict form, over

his objection, which was misleading. As to each of the four counts of the indictment, the verdict form read: "We the Jury find the Defendant _____ of _____." The court agreed to Atkins's request that the jury be instructed on the definition of involuntary manslaughter, but the court declined Atkins's request to include a separate line on the verdict form, after the lines for the numbered counts, "We the Jury, as to the lesser included offense of involuntary manslaughter, find the Defendant _____." Atkins argues that this omission requires a new trial because the form may have misled the jury into thinking that, after entering its "not guilty" verdict as to malice murder, it could not find him guilty of involuntary manslaughter for the homicide.

In deciding whether a verdict form accurately presented the law and properly guided the jury, this Court reviews the language of the form along with the trial court's instructions to the jury. *Rowland v. State*, 306 Ga. 59, 67-68 (6) (829 SE2d 81) (2019).

> In a criminal case, a verdict form is erroneous when the form would mislead jurors of reasonable understanding, or the trial court erroneously instructed the jury on the

14

presumption of innocence, the State's burden of proof, the possible verdicts that could be returned, or how the verdict should be entered on the printed form. A preprinted verdict form is treated as part of the jury instructions which are read and considered as a whole in determining whether there is error.

Id. at 68 (6) (citation and punctuation omitted). We have found no error in a murder case where a trial court instructed the jury on the lesser offenses of voluntary manslaughter and involuntary manslaughter, used a verdict form that provided a blank line beside each count of the indictment, instructed the jury to write its verdict on each count in the space provided, "and provided clear and detailed instructions on how to complete the verdict form whether the jury found [the defendant] not guilty, guilty of either of the lesser offenses, or guilty of the offense charged." *Jones v. State*, 303 Ga. 496, 503 (V) (813 SE2d 360) (2018). See also *Leeks v. State*, 296 Ga. 515, 522-523 (6) (769 SE2d 296) (2015); *Buttram v. State*, 280 Ga. 595, 599 (13) (631 SE2d 642) (2006). Thus, it is not error to fail to expressly include lesser offenses on a verdict form, provided the court appropriately instructs the jury on the lesser offenses and how

15

to fill in the verdict form. See *Jones*, 303 Ga. at 504 (V).

During closing argument in this case, defense counsel told the jury that it would be instructed about involuntary manslaughter, asked the jury to find Atkins not guilty of murder, felony murder, and aggravated assault, and argued that, based on the evidence, "the proper verdict" was involuntary manslaughter. During the State's closing argument, the prosecutor showed the verdict form to the jury and explained how to fill in the form. As to each murder count, the prosecutor told the jury that, if it found Atkins guilty or not guilty, the verdict would go in the first blank and the offense in the second blank. The prosecutor continued, "If you choose to find him guilty of a lesser included offense of involuntary manslaughter, then your verdict would be 'we the jury find the defendant guilty of involuntary manslaughter in Count 1 and . . . Count 2.'"

The court properly instructed the jury on the charged offenses, the State's burden of proof, and the presumption of innocence. Near the end of the jury charge, the court referred back to the prosecutor's review of the verdict form and reiterated that "[t]he first blank as to

16

each count is where you indicate your finding as to guilt or innocence" and "[t]he second blank is for you to make a finding as to what the charge is that you have made the finding of guilt or not guilty on the [first blank]." During jury deliberations, the jury sent a note asking the court to define, in writing, malice murder, felony murder, aggravated assault, intent, accident, and involuntary manslaughter. After consulting with counsel, the court provided the jury with written copies of the instructions that were requested.

The language of the verdict form, the explanations during closing argument about the jury's consideration of an involuntary manslaughter verdict and filling in the verdict form, and the trial court's jury charge, viewed together, show no error. See *Jones*, 303 Ga. at 504 (V); *Leeks*, 296 Ga. at 522-523 (6). In addition, the jury's request for definitional instructions, including for involuntary manslaughter, shows the jury's focused attention on involuntary manslaughter along with the charged offenses. This claim of error fails.

*Judgment affirmed. All the Justices concur, except Warren, J.,*

17

*not participating.*


Decided October 19, 2020.

Murder. McDuffie Superior Court. Before Judge Hammond.

*Howard W. Anderson III*, for appellant.

*William P. Doupe, District Attorney, Randi L. Harbeson, Debra R. Neumann, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Leslie A. Coots, Assistant Attorney General*, for appellee.