311 Ga. 269
FINAL COPY

S21A0322.  LOPEZ v. THE STATE.

PETERSON, Justice.

Fernando Lopez appeals his conviction for malice murder for the stabbing death of Corey Williams.[1] Lopez argues that the trial court admitted improper hearsay evidence against him: Williams's dying statements describing the stabbing and his assailant and Williams's statements describing his previous and intended future drug sales with Lopez. But the statements about the attack were admissible under the excited utterance hearsay exception, most of

---

[1] The crimes took place on January 26, 2012. On December 13, 2016, a DeKalb County grand jury indicted Lopez, charging him with malice murder, felony murder predicated on aggravated assault, and aggravated assault. The aggravated assault count was ultimately dismissed as untimely under the four-year statute of limitation. After a trial held on November 26 to 30, 2018, a jury found Lopez guilty of malice murder and felony murder. The trial court sentenced Lopez to life in prison with the possibility of parole for the malice murder charge. The felony murder charge was vacated by operation of law. On December 20, 2018, Lopez filed a motion for new trial, which he amended on February 10, 2020. The trial court denied his motion in an order entered on August 25, 2020. Lopez filed a timely notice of appeal, and the case was docketed to this Court's term beginning in December 2020 and submitted for a decision on the briefs.

the statements about drug sales were admissible under the residual hearsay exception, and the admission of the remaining statement about drug sales was harmless. We affirm.

The evidence presented at trial showed the following. On January 26, 2012, Corey Williams was sitting in the driver's seat of his car when he was stabbed by someone sitting in the passenger seat area. Williams drove two streets over and pulled up to three men: Dusty Smith, Aaron Bales, and Jacob Christmas. Williams blew his horn and called to them, yelling repeatedly that "Migo" or "Amigo" had stabbed him and asking them to call an ambulance. He had wounds to his arms and chest and acted like he was in pain, and there was a significant amount of blood on his chest and on the driver's side of the car. There also was a duffel bag in the rear passenger seat that Williams said belonged to Migo.

The men called 911 at 3:02 p.m., and Officer Brandon Mitchell arrived five to ten minutes later. Officer Mitchell rendered first aid and tried to calm Williams to keep him from going into shock, because Williams was "breathing pretty heavy and was obviously

2

very [shaken] up," and he was starting to wheeze. Williams described his assailant to Officer Mitchell as a Hispanic male known as "Amigo." Williams told Officer Mitchell and the other men that he had given his assailant a ride from the store for $40, but that as his passenger was reaching into the back of the car to retrieve his duffel bag, he stabbed Williams, screamed "mother f****r," and ran away. Williams died later that day from the stab wound to his chest.

Kenyatta Kitchen, a relative of Williams, identified Lopez in a photographic lineup as the person he saw get into the front passenger side of Williams's car and place his bag in the back passenger side approximately 20 minutes before Williams was stabbed. Fingerprints on paperwork in the duffel bag left in Williams's car matched Lopez's fingerprints, which were already on file. No other person's fingerprints were found on the paperwork. Police obtained a warrant for Lopez but were unable to locate him until September 2016, when he was arrested. DNA in buccal swabs obtained from Lopez matched DNA samples taken from a pair of underwear and a comb found in the duffel bag.

At Lopez's trial, Yolanda Sawyer, who had been friends with Williams for approximately 20 years prior to his death, testified that she and others, including Lopez, regularly used drugs in the apartment of a man known as "Mr. Peewee." Sawyer had known Lopez for ten years prior to the stabbing, but only as "Migo" or "Amigo." Two days before Williams was killed, Lopez returned to the area after a lengthy absence and used drugs in Peewee's apartment. Williams went in and out of Peewee's apartment many times while Lopez was there, and the day before the stabbing, Sawyer overheard Williams say that Migo owed him money. Sawyer assumed the debt was for drugs because Williams had previously sold drugs to both her and Lopez. The same day, she saw Williams and Lopez talking together as they entered Peewee's apartment.

Kitchen had known Williams for ten years and testified that he and Williams typically saw each other every day. Kitchen testified that he knew Lopez "on and off" for five or six years prior to the stabbing, but only by the nicknames "Amigo" or "Migo." Lopez had a pattern of returning to Williams's area of town for a week or two

after being absent for months or more. Two days before Williams died, Williams told Kitchen that Migo was back in town and "spending money," meaning that Lopez was buying drugs from Williams, and Kitchen observed Lopez going in and out of Peewee's apartment.

D'Metri Johnson testified that he and Williams had known each other for more than ten years and were "very close" friends who saw each other every day and sold cocaine in the same area. The day before Williams's death, Williams told Johnson that he had a customer named "Migo" who spent a large amount of money on drugs and that Williams significantly overcharged Migo for the drugs. On the day Williams died, he called Johnson at approximately 2:00 p.m., asked if Migo was outside, described what Migo was wearing, and asked Johnson if he would drive Migo to Williams's house so that Migo could pay the money he owed Williams and purchase more cocaine from him. Johnson saw a person matching Williams's description of Migo sitting on a stoop but said he was unable to drive Migo, so Williams told Johnson he

5

would pick up Migo himself. Johnson left his apartment, and when he returned at approximately 2:40 p.m., Migo was no longer there.

Johnson also testified that Williams called him at 3:00 p.m., saying that "Migo stabbed me" or "tried to kill me." Johnson asked Williams where he was, but Williams was speaking with someone in the background and did not respond. Johnson hung up and tried to call back, but Williams did not answer. Williams's cell phone log revealed that on the day of the stabbing, he called Johnson at 2:08 p.m., Johnson called Williams at 2:16 p.m., Williams called Johnson again at 3:00 p.m., and Williams later missed two calls from Johnson at 3:07 and at 3:08 p.m.

1. *The trial court did not abuse its discretion in admitting Williams's statements about the attack under the excited utterance hearsay exception.*

Lopez argues that the trial court erred in admitting Williams's statements regarding the stabbing under the excited utterance hearsay exception. We disagree.

At a pre-trial motions hearing, the State argued for admission of the statements Williams made to Smith, Bales, Officer Mitchell,

6

and Johnson describing the circumstances of his stabbing and giving the name and description of his attacker under the dying declaration and excited utterance hearsay exceptions. Defense counsel objected. The trial court ruled that the statements were admissible as excited utterances.

The excited utterance hearsay exception provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" will not be excluded by the hearsay rule. OCGA § 24-8-803 (2). "The critical inquiry is whether the declarant is still in a state of excitement resulting from that event when the declaration is made." *Atkins v. State*, 310 Ga. 246, 250 (2) (850 SE2d 103) (2020) (citation and punctuation omitted). To determine this, courts should consider the totality of the circumstances; it is not necessary that the statement be made contemporaneously with the startling event or condition. See *Blackmon v. State*, 306 Ga. 90, 94-95 (2) (829 SE2d 75) (2019) (trial court could reasonably conclude that declarant was still under the stress of her husband's threat to shoot when she made

7

a statement indicating her belief that her husband would kill her, although the threat occurred several minutes earlier); *Robbins v. State*, 300 Ga. 387, 389-390 (2) (793 SE2d 62) (2016) (a hearsay statement may be an excited utterance even when made hours after the startling event, if the declarant was still under the stress or excitement that the event caused). We review the trial court's admission of Williams's statements for abuse of discretion. See *Lyons v. State*, 309 Ga. 15, 21 (4) (843 SE2d 825) (2020).

Ample evidence in the record supports the trial court's finding that Williams was under the stress of excitement of a startling event — being stabbed — when he made the statements at issue. Witnesses testified that Williams honked his horn, yelled repeatedly that Migo stabbed him, and was so visibly shaken even after Officer Mitchell arrived that the officer noted his agitated mental state and tried to calm him down. Williams made the statements only a few minutes after he was stabbed because Kitchen saw him alive and uninjured a mere 20 minutes prior to Williams's telephone call to Johnson and his conversation with Smith and Bales describing the

8

stabbing. Moreover, Williams recounted the stabbing to Smith, Bales, and Johnson while seated in the car where the stabbing occurred and surrounded by his own blood. See *United States v. Belfast*, 611 F3d 783, 817-818 (11th Cir. 2010) (statement was an excited utterance even when made four hours after the startling event because the victim was unable to escape the location where the event occurred and thus likely continued to experience trauma from the incident).

Lopez argues that Williams's statements are "narratives" and thus inadmissible as excited utterances because Williams described details related to the stabbing, including the assailant's agreement to pay Williams $40 for a ride and the fact that the assailant was reaching into the back of the car to retrieve his bag when he stabbed Williams. But the cases Lopez cites for support of his argument that Williams's statements constituted an inadmissible "narrative" were decided under the former Evidence Code, which analyzed admissibility under the "res gestae" exception to hearsay in the former Code. See *Priebe v. State*, 250 Ga. App. 725, 727 (1) (553 SE2d

9

5) (2001) (narratives are generally the product of afterthought, and "the law altogether distrusts . . . afterthought" (citation and punctuation omitted)); *Williams v. State*, 144 Ga. App. 130, 132 (1) (240 SE2d 890) (1977) ("[N]arrative statements of the history of the event, usually made after the declarant has had time to reflect on the occurrence, are not admissible." (citation and punctuation omitted)). The current Evidence Code does not use the term "res gestae"; instead, it addresses the admission of an "excited utterance." *Hites v. State*, 296 Ga. 528, 531 (3) n.6 (769 SE2d 364) (2015). We have explained in cases decided under the current Evidence Code that the excited utterance exception does not require a declarant to express any particular emotion when making the statement, and that courts "need not find that the declarant was completely incapable of deliberative thought at the time [the declarant] uttered the declaration." *Blackmon*, 306 Ga. at 96 (2) (citation and punctuation omitted). Williams's statements easily fit the description of an excited utterance under the current Evidence Code, so the trial court did not abuse its discretion in admitting

10

them.

2. *Admitting Williams's statements regarding drug sales and related debt was not reversible error.*

Lopez argues that the trial court erred in admitting testimony by Sawyer, Kitchen, and Johnson regarding statements Williams made about his drug sales to Lopez and the debt Lopez owed him. Again, we disagree.

Prior to Lopez's trial, the State sought a ruling allowing it to introduce hearsay evidence under the residual exception to the hearsay rule found at OCGA § 24-8-807 ("Rule 807"): statements made by Williams to Kitchen and Johnson regarding Williams's drug sales to Migo, Migo's debt to Williams, and Williams's intended transactions with Migo on the day Williams was killed. Defense counsel argued that the trial court should exclude the statements. The court ruled in a pre-trial order that the statements were admissible under Rule 807. But Sawyer's testimony that she overheard Williams say that Migo owed him money was not the subject of a pre-trial hearing, and Lopez did not object to that

11

testimony at trial. Therefore, we review the admission of Williams's statements to Kitchen and Johnson for an abuse of discretion but review the statement to Sawyer only for plain error. See OCGA § 24-1-103 (d); *Rawls v. State*, 310 Ga. 209, 213 (3) (850 SE2d 90) (2020) (reviewing trial court's overruling of defendant's Rule 807 objections for an abuse of discretion, while reviewing the trial court's admission of the testimony to which defendant did not object only for plain error).

    (a)    *The trial court did not abuse its discretion in admitting Williams's statements to Kitchen and Johnson under the residual hearsay exception.*

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." OCGA § 24-8-801 (c). Generally, hearsay is inadmissible unless an exception applies. See OCGA § 24-8-802. The residual hearsay exception, Rule 807, states in part as follows:

> A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule,

12

if the court determines that:

(1) The statement is offered as evidence of a material fact;

(2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.

OCGA § 24-8-807.

The residual exception is to be used "very rarely[,]" only in "exceptional circumstances, and only when there exist[ ] certain *exceptional guarantees of trustworthiness* and high degrees of probativeness and necessity." *Atkins*, 310 Ga. at 251 (2) (citation and punctuation omitted; emphasis in original). Statements are considered sufficiently trustworthy "not because of the credibility of the witness reporting them in court, but because of the circumstances under which they were originally made." Id. (citation and punctuation omitted); see also *Miller v. State*, 303 Ga. 1, 5 (2) (810 SE2d 123) (2018) ("Whether there are exceptional guarantees of trustworthiness is a determination that focuses on the *declarant* and the circumstances under which the declarant made the

13

statement to the witness." (emphasis in original)).

In this case, the trial court determined that Williams's statements to Kitchen and Johnson were admissible under Rule 807 because the statements were offered as evidence of the material facts that Lopez owed Williams money for drugs and that Lopez's moniker was Amigo or Migo, there was no other evidence to establish these material facts, the statements were consistent, Williams had no reason to lie about Lopez owing him money for drugs, and the interests of justice would be best served by admitting the statements. Lopez argues that Rule 807 does not apply because non-hearsay testimony from multiple witnesses was sufficiently probative of the material facts that the State sought to prove to negate the State's need to use the hearsay testimony.

As the trial court found, there was no evidence apart from hearsay statements to show that Lopez owed Williams money for drugs, that Williams was overcharging Lopez for the drugs, and that 20 minutes before he was stabbed, Williams planned to meet Lopez

14

for Lopez to pay his debt and purchase more drugs.[2] These statements were "material as evidence of the nature of the relationship between [Lopez] and the victim that sheds light on [Lopez's] motive in committing the offenses charged." *Rawls*, 310 Ga. at 215 (3) (a) (i) (citation and punctuation omitted). And Lopez has not shown that the trial court erred in concluding that the evidence was more probative in showing Lopez's motive for stabbing Williams than any other evidence the State could procure through reasonable efforts.

The evidence also supports the trial court's finding that Williams's statements to Kitchen and Johnson had the requisite guarantees of trustworthiness. Testimony established that Williams had a very close relationship with both Kitchen and Johnson: he had

---

[2] As Lopez correctly contends, ample non-hearsay evidence existed showing that Lopez went by the name of "Amigo" or "Migo"; both Kitchen and Sawyer testified that they personally knew Lopez by those monikers. But to the extent that Lopez challenges hearsay statements that he was known as "Amigo" or "Migo," we hold that any admission was harmless because it was cumulative of the non-hearsay testimony of Kitchen and Sawyer. See *Davis v. State*, 302 Ga. 576, 583-584 (4) (805 SE2d 859) (2017) (even if statement fell outside of hearsay exception, its admission was harmless, because it was merely cumulative of other evidence).

15

known them for approximately ten years, spoke with them on a daily basis, and was related to Kitchen by marriage. Moreover, both Kitchen and Johnson knew that Williams sold drugs long before the stabbing occurred; in fact, Johnson was a fellow drug dealer. See *Rawls*, 310 Ga. at 215 (3) (a) (i) (victim's close relationship with witnesses gave her statements to them about her boyfriend's abuse sufficient guarantees of trustworthiness to be admissible under Rule 807); *Tyner v. State*, 305 Ga. 326, 330 (2) (825 SE2d 129) (2019) (trial court did not abuse its discretion by admitting statements under Rule 807 because the statements were made within the confines of the close relationship between the victim and her close friend, and the victim had no reason to lie to her friend regarding the issue). In addition, Williams's statements were consistent with non-hearsay evidence, including Sawyer's testimony that Williams sold drugs to Lopez previously and that Lopez and Williams talked together in an apartment where drug activity occurred regularly; Kitchen's testimony that he saw Migo get into Williams's vehicle approximately 20 minutes before Williams was stabbed; and

Williams's cell phone records, which corresponded with Johnson's description of the timing of his phone conversations with Williams.

The above factors support the trial court's conclusion, and we are "particularly hesitant to overturn a trial court's admissibility ruling under the residual hearsay exception absent a definite and firm conviction that the court made a clear error of judgment in the conclusion it reached based upon a weighing of the relevant factors." *Davenport v. State*, 309 Ga. 385, 390 (3) (846 SE2d 83) (2020) (citation and punctuation omitted). Accordingly, we see no abuse of discretion in the trial court's decision to admit Williams's statements. See *Reyes v. State*, 309 Ga. 660, 668 (2) (b) (847 SE2d 194) (2020) (no abuse of trial court's discretion in permitting testimony under Rule 807 where the decision was based on a number of factors that weighed in favor of finding declarant's statements to be trustworthy).

> (b) *The trial court did not commit plain error by admitting Williams's statement to Sawyer that Migo owed him money because Lopez did not show that the admission probably affected the outcome of his trial.*

17

To establish plain error, Lopez "must point to an error that was not affirmatively waived, the error must have been clear and not open to reasonable dispute, the error must have affected his substantial rights, and the error must have seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Denson v. State*, 307 Ga. 545, 547-548 (2) (837 SE2d 261) (2019) (citation and punctuation omitted). To show that his substantial rights were affected, Lopez must make an "affirmative showing that the error probably did affect the outcome below." *McKinney v. State*, 307 Ga. 129, 135 (2) (b) (834 SE2d 741) (2019) (citation and punctuation omitted). If Lopez fails to meet any one of the elements of the plain error test, his claim fails. See *Denson*, 307 Ga. at 548 (2).

Lopez has not shown that Sawyer's testimony regarding Williams's statement likely affected the outcome of his trial. Sawyer's passing statement that she overheard Williams say that Migo owed him money was cumulative of much more extensive testimony to that effect from Kitchen and Johnson. "[T]he erroneous admission of hearsay is harmless where substantial, cumulative,

18

legally admissible evidence of the same fact is introduced." *Anglin v. State*, 302 Ga. 333, 336 (2) (806 SE2d 573) (2017); see also *Davis v. State*, 302 Ga. 576, 584 (4) (805 SE2d 859) (2017). Also, the overall case against Lopez was strong: eyewitness testimony established that Lopez got into Williams's car approximately 20 minutes before the stabbing, and the bag found in Williams's car contained fingerprints and DNA that matched Lopez's. And ample evidence was presented that Lopez was the "Migo" that Williams identified as his assailant to multiple individuals. In the light of all the evidence, Lopez has failed to show that any error likely affected the outcome. See *Rawls*, 310 Ga. at 216 (3) (a) (ii) (defendant failed to show that hearsay testimony admitted under Rule 807 likely affected the outcome of his trial because the testimony was cumulative of properly admitted testimony and the overall case against the defendant was strong).

*Judgment affirmed. All the Justices concur.*

Decided April 5, 2021.

Murder. DeKalb Superior Court. Before Judge Hunter.

*Drew Eckl Farnham, Sara S. Becker*, for appellant.

*Sherry Boston, District Attorney, Deborah D. Wellborn, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.