NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 21, 2026

S25A1496.  WELLS v. THE STATE.

PINSON, Justice.

Tobias Raynard Wells was convicted of felony murder and other crimes in connection with the shooting death of Nashiem Hubbard-Etienne.[1] On appeal, he claims that the evidence was not sufficient to support his convictions; that the State misled the jury

---

[1] The shooting happened in the early morning hours of July 16, 2019. On October 22, 2019, a Fulton County grand jury indicted Wells and four co-defendants, Cortez Devon Banks, Johnerton Blake Gilstrap, Dontacus Brantley, and Kamiyah Lashae Street, for malice murder (Count 1), felony murder predicated on attempted armed robbery (Count 2), felony murder predicated on aggravated assault of Hubbard-Etienne (Count 3), felony murder predicated on aggravated assault of a surviving victim, Roland Pack (Count 4), attempted armed robbery (Count 8), aggravated assault of Hubbard-Etienne (Count 9), aggravated assault of Pack (Count 10), and possession of a firearm during the commission of a felony (Count 11). Banks and Gilstrap were also indicted on additional counts based on their possession of a firearm as, respectively, a first offender probationer and a convicted felon (Counts 5–7, 12–14). Street and Brantley pleaded guilty, but Wells, Banks, and Gilstrap pleaded not guilty and were tried together before a jury from October 11 to 20, 2023. Wells was found not guilty of malice murder and guilty of all other counts. He was sentenced to

about a plea deal that one testifying co-defendant received in exchange for her testimony; that the State prevented the defense from calling another co-defendant as a witness by offering him a plea deal but failing to sentence him; that the trial court instructed the jury incorrectly about circumstantial evidence; and that the trial court abused its discretion by failing to sever Wells's trial from those of his co-defendants.

These claims fail. The evidence was sufficient for a jury to find beyond a reasonable doubt that Wells was guilty of felony murder, at least as a party to the crime, based on his presence at the scene and his movements and communications with the other perpetrators before and after the shooting. The State did not mislead anyone about the plea deal it reached with the testifying co-defendant: the

---

life in prison for felony murder predicated on the aggravated assault of Hubbard-Etienne, 30 years in prison for attempted armed robbery, and 20 years in prison for the aggravated assault of Pack, all to be served concurrently, and five years of probation for possession of a firearm during the commission of a felony, to be served consecutively. The remaining counts merged for sentencing or were vacated by operation of law. Wells filed a timely motion for new trial, which he later amended twice through new counsel. After an evidentiary hearing, the trial court denied Wells's motion for new trial on May 6, 2025. Wells filed a timely notice of appeal. His appeal was docketed to the August 2025 term of this Court and submitted for a decision on the briefs.

deal was slightly modified after Wells's trial to avoid imposing a potentially illegal sentence, which was not improper. There is no evidence that the State engineered a plea deal with the non-testifying co-defendant to prevent him from testifying for the defense, and no authority to support such a claim. The trial court's oral and written instructions to the jury, taken as a whole, correctly informed the jury about circumstantial evidence. And Wells has not given any reason that his trial had to be severed. We therefore affirm Wells's convictions.

1. *Evidence at Trial*

The evidence at trial showed the following.

(a) On the night of July 15 to 16, 2019, Hubbard-Etienne was shot and killed in the parking garage of an apartment complex in southwest Atlanta. Hubbard-Etienne had been playing dice, for money, in an apartment in the complex that evening, and he was shot as he was leaving after the game had ended. A neighbor called 9-1-1 to report the shooting at 1:39 a.m. At trial, two people who were also part of the dice game testified about the shooting. One was

3

Roland Pack, who was with Hubbard-Etienne when he was shot. The other was Kamiyah Street, who participated in, and was later arrested for, the shooting.

Street described in detail the planning and execution of the crime. She testified that she went to play dice in the apartment after hearing about the game from Pack. In the apartment were Pack and "about four or five other people" she did not know. After two or three hours, a disagreement arose about the dice, and Pack decided to end the game. That decision upset Street, because up to that point Pack had been doing well and Street had been losing money — mostly to Pack. So Street wanted to keep playing. But the game ended, so Street left and drove to another apartment complex where she sometimes hung out.

At the second location, Street met up with Wells, Blake Gilstrap, Cortez Banks, and Dontacus Brantley. Street told the group that she had been gambling, that there was "quite a bit of money" there, and that they could get the money "by robbing them." The four men agreed to the plan.

4

The group left in Street's car. On the way back to the site of the dice game, the group dropped off Wells and Banks so that Wells could pick up a jacket to wear as a disguise. Then Street, Gilstrap, and Brantley continued on to the apartment complex, while staying in close contact with Wells. At 12:36 a.m., Street texted Wells, "We on the way to the move," which referred to the robbery. When Street, Gilstrap, and Brantley arrived in the parking garage, they saw that Pack's car was near the entrance to the complex, "as if he was fixing to leave," so Street texted Wells, "We tryna hurry up before they leave." Then, when Pack did leave, Street, Gilstrap, and Brantley followed him in Street's car. All the while, Street continued sending updates about their location to Wells, who had caught an Uber with Banks and was trying to meet them. Phone records showed that from 12:29 a.m. to 2:24 a.m. — from about an hour before the 9-1-1 call until about an hour afterwards — Street's phone had 27 incoming, outgoing, or missed calls with Wells's phone.

The group finally met up at around 1:30 a.m. at a convenience store near the site of the planned robbery. Wells and Banks got into

Street's car. At this point, Gilstrap and Banks had handguns, and Brantley had a fake rifle that "looked real." Street was unsure if Wells was armed. The five of them continued following Pack, who returned to the apartment complex.

Street followed Pack as he drove into the parking garage and parked. When Pack and his passenger — Hubbard-Etienne — got out of their car, Wells, Gilstrap, Banks, and Brantley got out of Street's car, with Gilstrap and Banks carrying their handguns. While Street was testifying, she was shown still photos taken from video surveillance footage of the shooting, and she identified Wells, Gilstrap, Banks, and Brantley in the photos.

When the four men got out of her car, Street started to drive away, having agreed to "circle around" and then pick the men up "once they were done." But she had gone no more than ten feet when she heard gunshots. She stopped the car, the four men got in, and the group drove away.

The next day, Street learned from Wells that someone had been killed during their attempted robbery. She also learned from Wells

that surveillance footage of the shooting had been shown on the news, and that her car was visible in the footage. On Wells's advice, Street had her car cleaned to remove any fingerprints. She also called 9-1-1 to report (falsely) that her car had been stolen. Phone records showed that at 7:50 a.m. that morning, Street's phone connected with Wells's phone for a video call lasting about three minutes, and then, seconds after that call ended, Street's phone called 9-1-1.

When police tracked Street down and interviewed her, she initially told them that her car had been stolen, and then that she had lost her keys, but she eventually confessed to her part in the events of that night. In her confession, she identified Wells, Gilstrap, Banks, and Brantley as the perpetrators along with herself, although at trial she described herself as the "mastermind" of the crime.

Pack also testified. He said that the dice game had ended without incident, although Street had been "pretty mad" because she had lost a few thousand dollars to him. Some time after the game ended,

7

Pack and Hubbard-Etienne left to drive to the corner store, which was near the apartment complex. They stayed there for a few minutes, bought a few items, and then returned to the complex. As they drove into the parking garage, Pack noticed a car he had never seen at the complex before, with people inside who appeared to be looking at him and Hubbard-Etienne. Pack became suspicious. He and Hubbard-Etienne got out of the car and started to walk toward the door out of the garage, heading back to the apartment where they had been playing dice. The other car then moved from its parking spot and parked next to the door out of the garage. Several masked figures got out of the car and started walking toward Pack and Hubbard-Etienne with guns drawn.

Pack testified that he turned and ran. Behind him, the masked figures opened fire. Pack was not hit. When Pack heard the other car drive away, he came out of hiding and went back to find that Hubbard-Etienne had been shot. Pack managed to get Hubbard-Etienne into the back seat of his car and drove out of the parking garage "as fast as possible." As he left the garage, he encountered

8

the Atlanta police, who had come in response to the neighbor's 9-1-1 call. By that time, Hubbard-Etienne was dead in Pack's back seat from a shot to his back.

(b) In the course of the police investigation, officers looked into the movements of Pack's car in the hours before the shooting. A detective searched for the car's license plate number in a City of Atlanta database of license-plate-camera recordings, which is available only to law enforcement. The database showed that the car was recorded at an intersection near the crime scene at 1:26:03 a.m. on the night of the shooting. The detective then searched for other license plates captured by the same camera around the same time, to see if anyone was following Pack's car. That search revealed that another car passed through the intersection 11 seconds after Pack did, traveling in the same direction. A further search for that second license plate number revealed that that same car was driving around near the scene of the shooting several hours before it happened, and then again less than an hour before. The detective determined that the car was registered to Street.

9

Investigators got phone records for Street's cell phone, as well as cell-site location information (CSLI) from her phone and the phones of Wells, Gilstrap, and Banks. The cell phone data, combined with license-plate-reader images of Street's car and the video surveillance of the shooting, painted a picture of the group's movements and communications on the night of the shooting. At 11:00 p.m., Gilstrap's phone made an outgoing call from the vicinity of Wells's address on the west side of Atlanta. At 11:53 p.m., Street's phone made two outgoing calls from the area where the dice game was taking place. A minute later, Street's phone Facetimed Gilstrap's phone. At 12:19 a.m., a license plate reader captured Street's car heading toward Wells's home. At 12:22 a.m. and 12:27 a.m., Wells's phone and Banks's phone, respectively, made outgoing calls from the area of Wells's home. At 12:29 a.m., Street's phone made an outgoing call, this time from the area of Wells's home. At 12:40 a.m., Street's car was recorded heading back toward the scene of the shooting. Eight minutes later, Gilstrap's phone made a call near the crime scene location. At 12:51 a.m. and 1:01 a.m., Wells's phone and Banks's

phone, respectively, made calls near Wells's home. Twenty-five minutes later, Street's car was recorded passing through an intersection 11 seconds behind Pack's car, as noted above. At 1:34 a.m., the two cars were recorded entering the apartment complex where the shooting took place. At 1:39 a.m. — just when the neighbor was calling 9-1-1 to report the shooting — Street's car was recorded leaving the complex. At that same moment, Wells's phone and Banks's phone both made calls from near the scene of the shooting. And within the next hour, Wells's, Gilstrap's, and Banks's phones all made calls near Wells's home.

Later on in their investigation, Wells was interviewed by police. The officer who conducted the interview testified at trial. The officer said that Wells waived his *Miranda*[2] rights and then admitted to being present at the shooting. At first, Wells claimed that he never got out of Street's car. But when the officer showed him the surveillance footage of the robbery and the still photos taken from

---

[2] *Miranda v. Arizona*, 384 US 436 (1966).

the video, Wells identified himself in the video and photos and admitted that he got out of the car. He still maintained, however, that he did not have a gun and was not a part of the robbery attempt.

(c) At trial, the State also introduced evidence that Hubbard-Etienne had fired shots during the incident. When the shooting happened, Hubbard-Etienne was carrying a gun that belonged to his mother. At the scene, investigators collected a large number of spent .40-caliber and 9-millimeter cartridge casings, projectiles, and fragments, and some of the 9-millimeter cartridge casings were later matched to Hubbard-Etienne's mother's gun. Hubbard-Etienne's hands tested positive for gunshot primer residue, a substance that is ejected when a gun is fired.

## 2. *Sufficiency of the Evidence*

Wells first claims that the evidence was not sufficient to sustain his convictions. We evaluate a due process challenge to the sufficiency of the evidence by "viewing the evidence presented at trial in the light most favorable to the verdicts, and asking whether any rational trier of fact could have found the defendant guilty beyond a

reasonable doubt." *Henderson v. State*, 317 Ga. 66, 72 (2023). "[C]onflicts or inconsistencies in the evidence, credibility of witnesses, and reasonable inferences to be derived from the facts" are for the jury to resolve. *Perkins v. State*, 313 Ga. 885, 891 (2022) (quotation marks omitted).

Under that standard, the evidence recounted above was more than sufficient to support Wells's conviction for felony murder. Street testified in detail about the crime — including Wells's role in its planning and execution — and much of the other trial evidence was consistent with her testimony. Cell phone evidence confirmed that the group was in close communication on the night of the shooting. License plate cameras and CSLI showed the defendants' movements that night, including their presence in the parking garage when the shooting happened. Pack's narrative of the shooting from the victims' perspective was largely consistent with what Street described. Surveillance footage from the shooting showed four men jumping out of Street's car, just as Street said. And Wells even identified himself to police as one of those men. That evidence authorized

a jury to conclude that Wells was one of the perpetrators of the shooting attack on Hubbard-Etienne and Pack. See *Williams v. State*, 315 Ga. 797, 804–05 (2023) (testimony of co-defendant, corroborated by other evidence including testimony from other witnesses and forensic blood evidence, was sufficient to sustain conviction).

The conclusion that the evidence was constitutionally sufficient is not defeated by any of Wells's several specific arguments about the evidence in this case. Wells contends, for instance, that the State did not establish who fired the shot that killed Hubbard-Etienne and did not show that Wells himself ever had a gun. But a defendant is guilty of a charged offense if he is a "party thereto," which can mean, among other things, that he "[i]ntentionally aid[ed] or abet[ted] in the commission of the crime." OCGA § 16-2-20(a) & (b)(3). And a jury is authorized to find that a defendant aided or abetted in a crime if it finds that the defendant shared a "common criminal intent with the direct perpetrators," which the jury can infer from the defendant's "presence, companionship, and conduct

14

with other perpetrators before, during, and after the crimes." *Fitts v. State*, 312 Ga. 134, 142 (2021) (quotation marks omitted). The jury here was authorized to make that finding: Street testified about how the group collectively decided to rob the dice game, and that, in preparation for that act, Wells stopped to get a jacket to use as a disguise. Cell phone evidence showed that Wells and Street were in close contact leading up to the shooting. And after the shooting, evidence showed that Street communicated with Wells about how to get rid of evidence of the crime. That evidence was sufficient to find that Wells shared a common criminal intent with the perpetrators, both as to the attempted robbery and the shooting. See *Willis v. State*, 315 Ga. 19, 25 (2022) (jury could conclude that defendant was "part of the group that committed the crimes" when cell phone evidence showed that he was at the crime scene, that he moved around the city with the perpetrators after the crimes, and that he was in communication with the other perpetrators throughout the day). Because the jury could find that Wells shared a criminal intent with the other perpetrators as to the shooting, the jury could find that he

was guilty of aggravated assault, at least as a party to the crime. See *Robinson v. State*, __ Ga. __, 921 SE2d 319, 325 (2025) (shooting at a person is aggravated assault). And the charge of felony murder did not require the State to prove that Wells intentionally killed Hubbard-Etienne, only that he intentionally committed a dangerous felony that foreseeably caused Hubbard-Etienne's death, either directly or as a party to the crime, see *Eubanks v. State*, 317 Ga. 563, 578 (2023), and aggravated assault is such a dangerous felony, see *Sanders v. State*, 313 Ga. 191, 198–99 (2022).

Wells also argues that the State did not prove that the co-defendants shot at Hubbard-Etienne before he fired at them — in essence, a self-defense argument. But the evidence recounted above authorized the jury to conclude that Wells and his co-defendants went back to the apartment complex to rob their victims and were the initial aggressors in the encounter. That authorized finding would in turn authorize the jury to reject a defense of justification. See OCGA § 16-3-21(b)(2) & (b)(3); *Bennett v. State*, 320 Ga. 580, 585 (2024) (jury could reject claim of self-defense when evidence showed

16

that defendant was initial aggressor); *State v. Brown*, 314 Ga. 588, 590–91 (2022) (a defendant is not justified in using deadly force if he uses it while attempting to commit, committing, or fleeing from a felony).

Finally, Wells argues that there was no evidence that any property was taken from the victims. But Wells was convicted of *attempted* armed robbery, which required the State to prove only that Wells intended to commit armed robbery and that he "perform[ed] any act which constitute[d] a substantial step toward the commission of the crime." OCGA § 16-4-1. As discussed above, the evidence was sufficient for the jury to conclude that Wells shared a common criminal intent to rob Hubbard-Etienne and Pack and that he took substantial steps to commit that act.

In sum, the evidence was more than sufficient to sustain Wells's convictions at least as a party to the crime. This claim of error therefore fails.

3. *Due Process Claim about Street's Plea Deal*

Wells next claims that the State violated his right to due process under *Brady v. Maryland*, 373 US 83 (1963), and *Giglio v. United States*, 405 US 150 (1972), by concealing from the jury and the defense the favorable terms of Street's plea deal.

(a) Before trial, in 2021, Street agreed to a negotiated plea deal. Under the deal, Street would plead guilty to all charges and provide truthful testimony against her co-defendants. In exchange, the State agreed to recommend a sentence of 25 years in prison, consisting of concurrent 20-year sentences for malice murder, attempted armed robbery, and the aggravated assault of Pack, and a consecutive five-year sentence for possession of a firearm during the commission of a felony. The 20-year sentence for malice murder represented a downward reduction from the statutory minimum life sentence for that offense. See OCGA § 16-5-1(e)(1) ("A person convicted of the offense of murder shall be punished by death, by imprisonment for life without parole, or by imprisonment for life."); OCGA § 17-10-6.1(e) ("In the court's discretion, the judge may depart from the mandatory

minimum sentence specified in this Code section for a person who is convicted of a serious violent felony when the prosecuting attorney and the defendant have agreed to a sentence that is below such mandatory minimum.").

At trial, Street testified for the State, as described at length above. At the end of her testimony, the State asked Street about her plea deal. Street confirmed that she had pleaded guilty to "[a]ll of the charges," including murder. She further testified that, as a result of her deal, she would serve 25 years in prison.

After trial, in October 2023, Street, having fulfilled her part of the plea deal, returned to the court for sentencing. However, in the meantime, this Court had issued a decision, *Polanco v. State*, 313 Ga. 598 (2022), which included a concurring opinion arguing that a trial court is not authorized by statute to impose a sentence of less than life in prison for murder. See id. at 600–01 (Ellington, J., concurring).[3] The prosecutor noted at Street's sentencing hearing that, as a result of the *Polanco* concurrence (although it is not binding

---

[3] We express no opinion here on whether this theory is correct.

precedent), "many prosecutors and defense bar and judges stopped that practice of sentencing a defendant to less than life" for murder. That change in practice implicated Street's plea deal, because, again, the deal provided that she would be sentenced to 20 years for malice murder. At Street's sentencing hearing, the parties and the trial court acknowledged that the original plea deal might now be illegal, and they discussed how the court could impose a legal sentence under the theory articulated in the *Polanco* concurrence that would "achieve[ ] essentially the same thing that both sides bargained for."

Ultimately, all involved agreed that Street would plead guilty to voluntary manslaughter rather than murder, and the rest of her original plea deal would not be affected. Street would be sentenced to the same 25-year total sentence as under her original deal. The court conducted a plea colloquy with Street about the revised deal, and then it imposed the agreed-on sentence.

(b) Due process requires the State to disclose to the defense evidence that is favorable to the accused. See *Brady*, 373 US at 87.

20

That may include evidence (like a favorable plea deal) that the defense might use to impeach a State witness. See *Giglio*, 405 US at 154–55; *Sauder v. State*, 318 Ga. 791, 807 (2024). And we have recognized that a defendant generally may tell the jury about a witness's plea deal, which bears on the witness's credibility. See, e.g., *Quintanar v. State*, 322 Ga. 61, 70–71 (2025).

Those rules were not broken here. When Street testified about her plea deal at trial, she accurately described the deal as it existed at the time. It was not until later that the deal was altered. And Wells has presented no evidence that the State withheld knowledge that the change was coming, or that there was any other deal that was not disclosed before or during trial. To the contrary, the record shows that the parties and the trial court altered the deal at Street's sentencing hearing — after the trial — to avoid imposing a sentence that might be void under the reasoning of the *Polanco* concurrence. Without showing that the State withheld useful impeachment evidence, Wells cannot succeed on a due process claim under *Brady* or *Giglio*. See *Sauder*, 318 Ga. at 807.

And Wells's claim fails for another reason. To prevail on a *Brady* claim, a defendant must show a reasonable probability that the outcome of his trial would have been different if the favorable evidence had been disclosed to the defense. See id. But Wells has not shown that he was reasonably likely to have been found not guilty if the jury had known about Street's revised plea deal. The revised deal was not materially different from the one that Street described at trial. Wells emphasizes that she told the jury she had pleaded guilty to murder but actually pleaded guilty to voluntary manslaughter. But Street was actually sentenced to 25 years in prison, just as she told the jury she would be. The marginal impeachment value of knowing that Street would technically have a different offense of conviction, when her prison sentence was not changed, was not likely to have made a difference to the jury. Cf. *Moore v. State*, 315 Ga. 263, 270 (2022) (counsel could reasonably have determined that a State witness "did not materially underrepresent the benefit he received by testifying" when the witness truthfully told the jury he would be sentenced under a plea deal to 35 years, to serve 30, but

misstated his maximum sentencing exposure as life plus 75 years rather than life without parole); *Benton v. Hines*, 306 Ga. 722, 725 (2019) (defendant was not prejudiced by counsel's failure to ask a witness about the maximum sentence the witness faced, because the jury already knew the witness "received a significant benefit in exchange for pleading guilty and testifying for the State").

Because Wells cannot show that the State misled him or the jury about Street's plea deal or withheld any relevant information, this claim fails.

4. *Due Process Claim about Brantley's Plea Deal*

Wells also raises a due process claim under *Brady* about the State's plea deal with the other co-defendant who pleaded guilty, Brantley. Wells contends, in essence, that the State engineered the deal to keep Brantley from giving testimony that would help the defense.

(a) In 2021, Brantley agreed to a plea deal similar to Street's. Like Street, Brantley pleaded guilty to all charges, including murder, and the State recommended a sentence of 25 years in prison,

consisting of 20 years for murder, a concurrent 20 years for the aggravated assault of Pack, and a consecutive five years for possession of a firearm during the commission of a felony. In exchange, Brantley agreed to testify truthfully and consistently with Street's testimony and the other trial evidence. Because Brantley's reduced sentence was "dependent on what testimony he provides, if any," in the trial of his co-defendants, Brantley was not sentenced before that trial.

In the end, the State decided not to call Brantley as a witness. But the *defense* noticed an intent to call him. When the defense did so, however, Brantley's counsel explained to the court that Brantley now wanted to revoke his plea of guilty, and that if he were called to testify, he would exercise his right to remain silent under the Fifth Amendment to the United States Constitution — a right that was still available to him because he had not yet been sentenced. See *Mitchell v. United States*, 526 US 314, 326 (1999). The State then added that if Brantley testified for the defense and "[went] off the rails" — that is, if he testified inconsistently with Street's testimony

24

or the trial evidence — then he would lose the benefit of his plea deal and would be exposed to a life sentence. The defense acknowledged that it could not offer Brantley the same kind of deal or protection that the State could.

The court observed that the situation was "unusual." But after confirming with Brantley that he would indeed plead the Fifth if called, the court decided not to allow that to happen "in front of the jury," and Brantley did not testify. After the trial, Brantley was sentenced under a modified plea deal that, like Street's modified deal, allowed him to plead guilty to voluntary manslaughter rather than murder so that he could receive the sentence he bargained for without running afoul of the reasoning of the *Polanco* concurrence.

At the motion-for-new-trial hearing, the prosecutor explained that Brantley's testimony was "not necessary," because Street's testimony was comprehensive and well-corroborated, and that Brantley was a less credible witness because he had maintained his innocence until he was offered a plea deal. The prosecutor therefore made a "strategic decision that the risks of putting him on the stand

outweighed any benefit." The prosecutor testified that the State was not trying to coerce Brantley not to testify for the defense. Brantley himself did not testify at the motion-for-new-trial hearing.

(b) Wells claims that there were two different "due process violations" relating to Brantley's plea deal. First, he claims, as he did with Street, that the State improperly failed to inform the jury and the defense about the "actual" terms of the plea deal, because the terms of the deal were changed after Wells's trial to benefit Brantley. As an initial matter, Wells has cited no authority to support his contention that the State must disclose to the defendant and the jury the terms of a plea deal that the State has reached with a *non-testifying* co-defendant — and we are aware of none. Wells relies instead on *Giglio* and *Napue v. Illinois*, 360 US 264 (1959), but both of those decisions address the defendant's due process rights with respect to State *witnesses*. See *Giglio*, 405 US at 154–55 (jury is entitled to know of "any understanding or agreement as to a future prosecution" between the State and a witness, because any such agreement or understanding would be "relevant to his credibility"); *Napue*, 360

26

US at 269–70 (State may not knowingly use false testimony to obtain a conviction, even if the false testimony "goes only to the credibility of the witness"). And even if the State was obligated to disclose the terms of Brantley's plea deal, Wells's claim still fails, for the same reasons that his claim about Street's plea deal fails. That is, Wells has not shown that the State withheld information about Brantley's deal during Wells's trial, and he has not established a reasonable probability that the result of his trial would have been different if the jury had been told about Brantley's deal. See *Sauder*, 318 Ga. at 807.

Wells also suggests that the State deliberately "set up" the plea deal, and then withheld sentencing Brantley until after Wells's trial, to prevent Brantley from testifying for the defense. To the extent that this argument can be understood as a claim of prosecutorial misconduct, Wells must show both "actual misconduct" and "demonstrable prejudice to his right to a fair trial." *Pierce v. State*, 319 Ga. 846, 864 (2024) (quotation marks omitted). And Wells has shown neither. First, he has not provided any evidence of a deliberate "set

27

up." He gives no support at all for his claim that the State *never* intended to call Brantley and that it agreed to a plea deal purely to maintain leverage over him and prevent him from testifying for the defense. And Wells also has not shown "demonstrable prejudice" from Brantley's failure to testify. Brantley did not testify at the motion-for-new-trial hearing about what he might have said at trial, and Wells does not even suggest in his briefing what Brantley's trial testimony would have been. Wells therefore has not shown that Brantley's testimony would have been helpful to him. In short, Wells has not shown evidence of either "actual misconduct" or "demonstrable prejudice," so the claim fails. See id.

5. *Jury Instruction about Circumstantial Evidence*

Wells next contends that the trial court instructed the jury incorrectly about circumstantial evidence. In Wells's view, the court's instruction allowed the jury to find Wells guilty even if the evidence was entirely circumstantial and did not exclude *every* reasonable hypothesis other than Wells's guilt. See OCGA § 24-14-6.

(a) During the jury charge, the trial court instructed the jury

28

about evidence. The court told the jury, among other things, that "[y]ou would be authorized to convict only if the evidence, whether direct, or circumstantial, or both excludes all reasonable theories of innocence, and proves the guilt of the accused beyond a reasonable doubt." Shortly after that, the court said: "To authorize a conviction on circumstantial evidence, the proved facts must not only be consistent with the theory of guilt, but must also exclude other reasonable theories other than the guilt of the accused." After the jury retired, the court asked counsel if there were any objections to the instructions. Wells said that the second of these instructions had omitted the crucial word "every," as in, the evidence "must exclude *every* other reasonable theory other than the guilt of the accused." The court asked whether Wells wanted the court to re-instruct the jury. The court noted that the jury would get a written copy of the instructions that included the word "every," and that, "taken as a whole, it's absolutely clear what the actual law is." Wells declined to have the jury re-instructed. He told the court: "If they are going to get a written copy, that will be fine. Wanted to note my objection."

29

(b) As an initial matter, although Wells declined the trial court's offer to re-instruct the jury, we assume without deciding that this claim of error is preserved for our review. Cf. *Woodard v. State*, 296 Ga. 803, 810 (2015) (defendant waived appellate review of trial court's pattern jury instruction about self-defense when the defendant requested the pattern instruction, participated in a discussion of the part of the instruction challenged on appeal, and then, "despite their awareness and discussion of [the issue on appeal], did not withdraw the request that the court give the full self-defense pattern instruction").

When a defendant has objected to a jury instruction, we review the instruction de novo. See *Campbell v. State*, 320 Ga. 333, 347 (2024). In that review, we consider the court's oral and written instructions as a whole to determine whether there was error. See *Taylor v. State*, 316 Ga. 17, 20 (2023); *Murray v. State*, 295 Ga. 289, 294–95 (2014) (considering written jury instructions together with oral instructions in determining that instructions as a whole correctly informed the jury about the law).

Here, the trial court's instructions, taken as a whole, correctly informed the jury about circumstantial evidence. Under Georgia statutory law, a conviction that rests on circumstantial evidence alone cannot stand unless the evidence "exclude[s] every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. That is just what the trial court's oral and written instructions told the jury. Even if the court omitted the word "every" in the part of the instructions that Wells challenges, the court had told the jury before that it could not find Wells guilty unless the evidence "excludes all reasonable theories of innocence." And the court's written instructions corrected the misstatement even in the instruction that Wells challenges. Taken together, then, the instructions correctly told the jury that it could not find Wells guilty unless the evidence excluded all other reasonable theories. Because the jury was properly instructed about the law, this claim of error fails. See *Wilson v. State*, 315 Ga. 728, 735–36 (2023) (no error in failing to give requested instruction about proximate cause in felony murder trial

because the court's instructions, taken together, "adequately in-formed the jury about the principles of proximate cause that applied to this case"); *Atkins v. State*, 310 Ga. 246, 252–53 (2020) (no error in presenting jury with arguably misleading verdict form when the court properly instructed the jury on the charged offenses, the State's burden of proof, and the presumption of innocence).

6. *Failure to Sever Trials*

Finally, Wells contends that the trial court should have severed his trial from those of his co-defendants, Banks and Gilstrap, be-cause, in Wells's view, Banks's and Gilstrap's attorneys had a con-flict of interest. We review a trial court's decision on a motion to sever for abuse of discretion. See *Campbell*, 320 Ga. at 339.

(a) Wells had two trials in this case. Before the first one, Wells moved to sever his trial from those of his co-defendants. At a pre-trial hearing, the State indicated its intent to try Wells and Street separately from the other co-defendants, and so the trial court granted the motion to sever, as the State had consented. Wells was

then apparently tried separately in November 2021. The full transcript and outcome of that proceeding are not in the record here, but one way or another, Wells got a second trial. At that second trial — the one that resulted in his convictions here — he was tried jointly with Gilstrap and Banks. Wells did not move to sever the second trial.

(b) As with Wells's previous claim of error, we assume without deciding that his claim about severance is preserved for appellate review, even though he never moved to sever *this* trial in the trial court.

When multiple defendants are jointly indicted for a felony where the State does not seek the death penalty, the defendants "may be tried jointly or separately at the discretion of the trial court." OCGA § 17-8-4(a). The factors to be considered when ruling on a motion to sever are (1) the likelihood of confusion of the evidence and law, (2) the possibility that evidence against one defendant may be considered against another defendant, and (3) the presence or absence or antagonistic defenses. See *Terrell v. State*, 313

Ga. 120, 129 (2022).

Wells has not shown that those (or any other) factors required his trial to be severed. The basis for severance here, in Wells's view, was that the lawyers of his two co-defendants had a conflict of interest between them, in that they were law partners who "had conferred together to develop their defense strategy" and "did work on other criminal cases together." Wells contends, without much explanation, that that relationship violated certain of the Georgia Rules of Professional Conduct. But even if Wells could show that his *co-defendants'* counsels' professional relationship amounted to an "actual conflict of interest" that "significantly and adversely affected" their performance, see *Hall v. Jackson*, 310 Ga. 714, 720 (2021) (quotation marks omitted) — which he has not done — he has provided no support at all for his claim that that conflict somehow implicated *his* right to effective, conflict-free counsel. And we are aware of none. Wells also has not shown that any conflict between his co-defendants' lawyers gave rise to confusion of the evidence and law, the possibility that evidence against one defendant would be considered

against another, or antagonistic defenses. See *Terrell*, 313 Ga. at 129. In sum, he has not shown that his trial was required to be severed, and so this claim fails.

*Judgment affirmed. All the Justices concur.*